919 So.2d 392 (2006)
John Ellis "Jeb" BUSH, etc., et al., Appellants,
v.
Ruth D. HOLMES, et al., Appellees.
Charles J. Crist, Jr., etc., Appellant,
v.
Ruth D. Holmes, et al., Appellees.
Brenda McShane, etc., et al., Appellants,
v.
Ruth D. Holmes, et al., Appellees.
Nos. SC04-2323 to SC-4-2325.
Supreme Court of Florida.
January 5, 2006.
*395 Barry Richard and M. Hope Keating of Greenberg Traurig, P.A., Daniel Woodring, General Counsel, Nathan A. Adams, IV, Deputy General Counsel, Florida Department *396 of Education, and Raquel A. Rodriguez, General Counsel and Robert H. Fernandez, Deputy General Counsel, Office of the Governor, Tallahassee, FL, for Appellants John Ellis "Jeb" Bush, etc., et al.
Charles J. Crist, Jr., Attorney General, Christopher M. Kise, Solicitor General, Louis F. Hubener, Chief Deputy Solicitor General, Erik M. Figlio, and James A. McKee, Deputy Solicitor Generals, Tallahassee, FL, for Appellants Charles J. Crist, Jr., etc.
Clark M. Neily and Clint Bolick of the Institute of Justice, Washington, D.C., Kenneth W. Sukhia of Fowler, White, Boggs and Banker, P.A., Tallahassee, FL and Major B. Harding and Jason Gonzalez of Ausley and McMullen, Tallahassee, FL, for Appellants Brenda McShane, etc., et al.
Ronald G. Meyer of Meyer and Brooks, P.A., Tallahassee, FL; Robert H. Chanin and John M. West of Bredhoff and Kaiser, PLLC, Washington, D.C., Pamela L. Cooper, Florida Education Association, Tallahassee, FL, Randall Marshall, ACLU Foundation of Florida, Inc., Miami, FL, David Strom, American Federation of Teachers, Washington, D.C., Joan Peppard, Anti-Defamation League, Miami, FL, Steven M. Freeman and Steven Sheinberg, Anti-Defamation League, New York, NY, Ayesha N. Khan and Richard B. Katskee, Americans United For Separation of Church and State, Washington, D.C., Elliot M. Mincberg and Judith E. Schaeffer, People for the America Way Foundation, Washington, D.C., Steven R. Shapiro, American Civil Liberties Union Foundation, New York, NY, Michael A. Sussman, National Association for the Advancement of Colored People, Goshen, NY, Marc D. Stern, American Jewish Congress, New York, NY, Julie Underwood, National School Boards Association, Alexandra, VA, and Jeffrey P. Sinensky, American Jewish Committee, New York, NY, for Appellees Ruth D. Holmes, et al.
Valerie A. Fernandez, Coral Gables, on behalf of Independent Voices for Better Education, Teachers for Better Education, Ira J. Paul, and Pacific Legal Foundation; Gregory R. Miller, United States Attorney and E. Bryan Wilson, Assistant United States Attorney, Northern District of Florida, Tallahassee, FL and David K. Flynn, Eric W. Treene, Gordon Todd Conor Dugan, and R. Alexander Acosta, Assistant Attorney General Attorneys for United States Department of Justice, Civil Rights Division, Washington, D.C., on behalf of The United States; Carlos G. Muniz of GrayRobinson, P.A., Local Counsel, Tallahassee, FL, G. Marcus Cole, Professor of Law, Stanford Law School, Stanford, CA, and Briscoe R. Smith, Atlantic Legal Foundation, New York, NY, on behalf of Black Alliance for Education Options, Hispanic Council for Reform and Educational Options, Excellent Education for Everyone, Center for Education Reform and Reason Foundation.
Stephen C. Emmanuel of Ausley and McMullen, Tallahassee, FL, Professor Thomas C. Berg, University of St. Thomas School of Law, Minneapolis, MN, and Professor Richard W. Garnett, University of Notre Dame School of Law, Notre Dame, IN, on behalf of Florida Catholic Conference, Inc., Association of Christian Schools International, Christian Schools International, Friends of Lubavitch of Florida, Inc., Salvation Army-Florida Division, American Center for Law and Justice, and Christian Legal Society.
Isaac M. Jaroslawicz of Givner and Jaroslawicz, Miami, FL, Anthony R. Picarello, Jr. and Derek L. Gaubatz, Washington, D.C., on behalf of The Becket Fund for Religious Liberty.
*397 Scott D. Makar, Chief, Appellate Division, Office of General Counsel and Devin J. Reed, Director, Department of Procurement, Jacksonville, FL, on behalf of The City of Jacksonville, Office of the Mayor.
Lansing C. Scriven, Tampa, FL, Robert R. Gasaway, Ashley C. Parrish and Padraic B. Fennelly of Kirkland and Ellis, LLP, Washington, D.C., on behalf of The Coalition of McKay Scholarship Schools; The Florida Association of Academic Nonpublic Schools; The Florida Council of Independent Schools; The Florida Association of Christian Colleges and Schools; The Child Development Education Alliance; Redemptive Life Academy; Leah Ashley Cousart; Ed and Carmen Delgado; Martha Parker; and Michelle Emery.
Timothy W. Weber and Andrew W. Lennox of Battaglia, Ross, Dicus and Wein, P.A., St. Petersburg, FL, on behalf of The Berkshire School, Sagemount Learning Academy, The Broach School, Pathways School, The Randazzo School, Victoria's Higher Learning Academy and Glades Day School, as Amici Curiae in support of Appellants.
Talbot D' Alemberte, Florida State University, College of Law, Tallahassee, FL, on behalf of Professor Steven G. Gey.
Karen Gievers, Tallahassee, FL and Steven K. Green, Williamette University, College of Law, Salem, OR, on behalf of The Baptist Joint Committee, The Union for Reform Judaism, Americans for Religious Liberty, The National Council of Jewish Women, and The Jewish Labor Committee.
Bill McBride, Tampa, FL, on behalf of The National PTA, The National School Boards Association, The American Association of School Administrators, The National Association of Bilingual Educators, The United Church of Christ Justice and Witness Ministries, and The International Reading Association, as Amici Curiae in support of Appellees.
Timothy W. Weber and Andrew W. Lennox of Battaglia, Ross, Dicus and Wein, P.A., St. Petersburg, FL, on behalf of Lyonsdown School, Inc. d/b/a The Berkshire School, Sagemount Learning Academy, Inc., The Broach School of Jacksonville, Inc. d/b/a Broach School Mandarin, Pathways School, Inc., Alternate Education Systems, Inc. d/b/a The Randazzo School, Victoria's Higher Learning Academy, Inc., and Glades Day School, Inc., as Amici CuriaeNon-party.
PARIENTE, C.J.
Because a state statute was declared unconstitutional by the First District Court of Appeal, this Court is required by the Florida Constitution to hear this appeal. See art. V, § 3(b)(1), Fla. Const. The issue we decide is whether the State of Florida is prohibited by the Florida Constitution from expending public funds to allow students to obtain a private school education in kindergarten through grade twelve, as an alternative to a public school education. The law in question, now codified at section 1002.38, Florida Statutes (2005), authorizes a system of school vouchers and is known as the Opportunity Scholarship Program (OSP).
Under the OSP, a student from a public school that fails to meet certain minimum state standards has two options. The first is to move to another public school with a satisfactory record under the state standards. The second option is to receive funds from the public treasury, which would otherwise have gone to the student's school district, to pay the student's tuition at a private school. The narrow question we address is whether the second option violates a part of the Florida Constitution requiring the state to both provide for "the education of all children residing within its *398 borders" and provide "by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education." Art. IX, § 1(a), Fla. Const.
As a general rule, courts may not reweigh the competing policy concerns underlying a legislative enactment. The arguments of public policy supporting both sides in this dispute have obvious merit, and the Legislature with the Governor's assent has resolved the ensuing debate in favor of the proponents of the program. In most cases, that would be the end of the matter. However, as is equally self-evident, the usual deference given to the Legislature's resolution of public policy issues is at all times circumscribed by the Constitution. Acting within its constitutional limits, the Legislature's power to resolve issues of civic debate receives great deference. Beyond those limits, the Constitution must prevail over any enactment contrary to it.
Thus, in reviewing the issue before us, the justices emphatically are not examining whether the public policy decision made by the other branches is wise or unwise, desirable or undesirable. Nor are we examining whether the Legislature intended to supplant or replace the public school system to any greater or lesser extent. Indeed, we acknowledge, as does the dissent, that the statute at issue here is limited in the number of students it affects. However, the question we face today does not turn on the soundness of the legislation or the relatively small numbers of students affected. Rather, the issue is what limits the Constitution imposes on the Legislature. We make no distinction between a small violation of the Constitution and a large one. Both are equally invalid. Indeed, in the system of government envisioned by the Founding Fathers, we abhor the small violation precisely because it is precedent for the larger one.
Our inquiry begins with the plain language of the second and third sentences of article IX, section 1(a) of the Constitution. The relevant words are these: "It is ... a paramount duty of the state to make adequate provision for the education of all children residing within its borders." Using the same term, "adequate provision," article IX, section 1(a) further states: "Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools." For reasons expressed more fully below, we find that the OSP violates this language. It diverts public dollars into separate private systems parallel to and in competition with the free public schools that are the sole means set out in the Constitution for the state to provide for the education of Florida's children. This diversion not only reduces money available to the free schools, but also funds private schools that are not "uniform" when compared with each other or the public system. Many standards imposed by law on the public schools are inapplicable to the private schools receiving public monies. In sum, through the OSP the state is fostering plural, nonuniform systems of education in direct violation of the constitutional mandate for a uniform system of free public schools. Because we determine that the OSP is unconstitutional as a violation of article IX, section 1(a), we find it unnecessary to address whether the OSP is a violation of the "no aid" provision in article I, section 3 of the Constitution, as held by the First District.

PROCEDURAL HISTORY
Various parents of children in Florida elementary and secondary schools and several organizations (hereinafter collectively referred to as the plaintiffs) filed complaints *399 in the circuit court challenging the constitutionality of the OSP under article I, section 3, article IX, section 1, and article IX, section 6 of the Florida Constitution, as well as under the Establishment Clause of the First Amendment to the United States Constitution. The trial court found that the OSP was facially unconstitutional under article IX, section 1 of the Florida Constitution. On appeal, a panel of the First District reversed, concluding that "nothing in article IX, section 1 clearly prohibits the Legislature from allowing the well-delineated use of public funds for private school education, particularly in circumstances where the Legislature finds such use is necessary." Bush v. Holmes, 767 So.2d 668, 675 (Fla. 1st DCA 2000) (Holmes I) (footnote omitted). The First District declined to address the other constitutional issues raised and remanded for further proceedings. See id. at 677. This Court denied discretionary review. See Holmes v. Bush, 790 So.2d 1104 (Fla. 2001).
While the case was pending on remand, the United States Supreme Court held that the Ohio Pilot Project Scholarship Program, a voucher program similar to the OSP, was constitutional under the Establishment Clause. See Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). The plaintiffs in this case then voluntarily dismissed their challenges under the Establishment Clause,[1] leaving undecided only the issue of whether the OSP was facially constitutional under article I, section 3 of the Florida Constitution.[2]
The circuit court entered final summary judgment in favor of the plaintiffs, declaring the OSP unconstitutional. The trial court found that the OSP violated the last sentence of article I, section 3, referred to as the "no aid" provision. A divided panel of the First District affirmed the trial court's order. See Bush v. Holmes, 29 Fla. L. Weekly D1877 (Fla. 1st DCA Aug.16, 2004). The district court subsequently withdrew the panel opinion and issued an en banc decision in which a majority of the First District again affirmed the trial court's order. See Bush v. Holmes, 886 So.2d 340, 366 (Fla. 1st DCA 2004) (Holmes II). In a separate concurring opinion in which four other judges concurred, Judge Benton suggested that he would also have found the OSP unconstitutional under article IX, section 1. See Bush, 886 So.2d at 377 (Benton, J., concurring).

ANALYSIS
Because both issues are questions of law, we review both the First District's interpretation of article IX, section 1(a) and its determination that the OSP violates the constitutional provision de novo, without deference to the decision below. See Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004) ("[C]onstitutional interpretation... is performed de novo."); D'Angelo v. Fitzmaurice, 863 So.2d 311, *400 314 (Fla.2003) (stating that in a de novo review, "no deference is given to the judgment of the lower courts"). In interpreting article IX, section 1(a), we follow principles parallel to those guiding statutory construction. See Zingale, 885 So.2d at 282; Coastal Fla. Police Benevolent Ass'n v. Williams, 838 So.2d 543, 548 (Fla.2003).
In the analysis that follows, we first examine the operation of section 1002.38, Florida Statutes, which authorizes the OSP, then explore both the language and history of article IX, section 1(a). We then explain our conclusion that the OSP violates article IX, section 1(a).

I. The Opportunity Scholarship Program
The OSP provides that a student who attends or is assigned to attend a failing public school may attend a higher performing public school or use a scholarship provided by the state to attend a participating private school. See § 1002.38(2)(a), (3), Fla. Stat. (2005). In re-authorizing this program in 2002, the Legislature stated:
(1) FINDINGS AND INTENT. The purpose of this section is to provide enhanced opportunity for students in this state to gain the knowledge and skills necessary for postsecondary education, a career education, or the world of work. The Legislature recognizes that the voters of the State of Florida, in the November 1998 general election, amended s. 1, Art. IX of the Florida Constitution so as to make education a paramount duty of the state. The Legislature finds that the State Constitution requires the state to provide a uniform, safe, secure, efficient, and high-quality system which allows the opportunity to obtain a high-quality education. The Legislature further finds that a student should not be compelled, against the wishes of the student's parent, to remain in a school found by the state to be failing for 2 years in a 4-year period. The Legislature shall make available opportunity scholarships in order to give parents the opportunity for their children to attend a public school that is performing satisfactorily or to attend an eligible private school when the parent chooses to apply the equivalent of the public education funds generated by his or her child to the cost of tuition in the eligible private school as provided in paragraph (6)(a). Eligibility of a private school shall include the control and accountability requirements that, coupled with the exercise of parental choice, are reasonably necessary to secure the educational public purpose, as delineated in subsection (4).
§ 1002.38(1), Fla. Stat. (2005).[3]
Section 1002.38(4), Florida Statutes (2005), which sets forth the eligibility requirements for private schools accepting OSP students, provides that these schools "may be sectarian or nonsectarian," and must:
(a) Demonstrate fiscal soundness....
(b) Notify the Department of Education and the school district in whose service area the school is located of its intent to participate in the program under this section....
(c) Comply with the antidiscrimination provisions of 42 U.S.C. s. 2000d.
(d) Meet state and local health and safety laws and codes.
(e) Accept scholarship students on an entirely random and religious-neutral *401 basis without regard to the student's past academic history; however, the private school may give preference in accepting applications to siblings of students who have already been accepted on a random and religious-neutral basis.
(f) Be subject to the instruction, curriculum, and attendance criteria adopted by an appropriate nonpublic school accrediting body and be academically accountable to the parent for meeting the educational needs of the student. The private school must furnish a school profile which includes student performance.
(g) Employ or contract with teachers who hold a baccalaureate or higher degree, or have at least 3 years of teaching experience in public or private schools, or have special skills, knowledge, or expertise that qualifies them to provide instruction in subjects taught.
(h) Comply with all state statutes relating to private schools.
(i) Accept as full tuition and fees the amount provided by the state for each student.
(j) Agree not to compel any student attending the private school on an opportunity scholarship to profess a specific ideological belief, to pray, or to worship.
(k) Adhere to the tenets of its published disciplinary procedures prior to the expulsion of any opportunity scholarship student.
§ 1002.38(4)(a)-(k), Fla. Stat (2005).
The OSP also places obligations on students participating in the program and their parents. See § 1002.38(5), Fla. Stat. (2005). In addition to requiring the student to remain in attendance at the private school throughout the school year and the parent to comply with the private school's parental involvement requirements, section 1002.38(5) also requires the parent to ensure that the participating student "takes all statewide assessments required pursuant to s. 1008.22." § 1002.38(5)(c), Fla. Stat. (2005).[4] A failure to comply with any of these requirements results in a forfeiture of the scholarship. See § 1002.38(5)(d), Fla. Stat. (2005). However, unless forfeited, the scholarship "remain[s] in force until the student returns to a public school or, if the students chooses to attend a private school the highest grade of which is grade 8, until the student matriculates to high school and the public high school to which the student is assigned is an accredited school with a performance grade category designation of `C' or better." § 1002.38(2)(b), Fla. Stat. (2005). In other words, the OSP allows the student to remain in the private school of his or her choice, and even switch private schools, regardless of whether the student's assigned public school improves its grade in the interim. The only circumstance in which a student who has elected to attend a private school must return to a public school is if the private school ends at grade eight and the public high school to which the student is assigned has received a grade of C or better.
Section 1002.38(6), Florida Statutes (2005), provides the method for funding and payment of opportunity scholarships. The maximum amount of an opportunity scholarship is "equivalent to the base student allocation in the Florida Education Finance Program multiplied by the appropriate cost factor for the educational program that would have been provided for *402 the student in the district school to which he or she was assigned, multiplied by the district cost differential." § 1002.38(6)(a), Fla. Stat. (2005). This amount includes "the per-student share of instructional materials funds, technology funds, and other categorical funds as provided for this purpose in the General Appropriations Act." Id. The funds for the opportunity scholarship are transferred "from each school district's appropriated funds ... to a separate account for the Opportunity Scholarship Program." § 1002.38(6)(f), Fla. Stat. (2005). Accordingly, the payment of the scholarships results in a reduction in the amount of funds available to the affected school district. The scholarship is made payable to the parent of the student who is then required to "restrictively endorse the warrant to the private school." § 1002.38(6)(g), Fla. Stat. (2005).

II. Language and History of Florida's Education Articles
The Florida Constitution has contained an education article since its inception in 1838. See art. X, Fla. Const. (1838).[5] The original education article contained only two brief sections that dealt almost exclusively with the preservation of public lands granted by the United States for the use of schools.[6] In 1849, the Legislature provided for a system of schools by authorizing the establishment of "common schools." See ch. 229, Laws of Fla. (1848).[7] The education article remained substantially the same in the 1861 and 1865 Constitutions. See art. X, Fla. Const. (1861); art. X, Fla. Const. (1865).
In 1868, the education article was significantly expanded, see art. VIII, §§ 1-9, Fla. Const. (1868), and included the first requirement that the state provide a system of free public schools for all Florida children:
Section 1. It is the paramount duty of the State to make ample provision for the education of all the children residing within its borders, without distinction or preference.
Section 2. The Legislature shall provide a uniform system of Common Schools, and a University, and shall provide for the liberal maintenance of the same. Instruction in them shall be free.
As this Court explained in Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400, 405 (Fla. 1996), "[b]y this change, education became the `paramount duty of the State' and required the State to make `ample provision for the education of all the children.'"
In 1885, the education provisions were moved to article XII and the provision imposing a "paramount duty" on "the State to make ample provision for the education of all the children" was deleted. See art. XII, § 1, Fla. Const. (1885). Section *403 1 of article XII simply provided that "[t]he Legislature shall provide for a uniform system of public free schools, and shall provide for the liberal maintenance of the same."[8]
The adoption of the 1968 Constitution saw another substantial revision of the education article, with section 1 of article IX providing that
[a]dequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.
Art. IX, § 1, Fla. Const. (1968). The new reference to "other public education programs" referred "to the existing systems of junior colleges, adult education, etc., which are not strictly within the general conception of free public schools or institutions of higher learning." Bd. of Pub. Instruction v. State Treasurer, 231 So.2d 1, 2 (Fla.1970). The effect of the addition of the phrase "adequate provision" was analyzed in Coalition for Adequacy & Fairness, in which we ultimately concluded that it is the Legislature, not the Court, that is vested with the power to decide what funding is "adequate." See 680 So.2d at 406-07.
In 1998, in response in part to Coalition for Adequacy & Fairness, the Constitutional Revision Commission proposed and the citizens of this state approved an amendment to article IX, section 1 to make clear that education is a "fundamental value" and "a paramount duty of the state," and to provide standards by which to measure the adequacy of the public school education provided by the state:

The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
Art. IX, § 1(a), Fla. Const. (emphasis supplied).
A commentary on the 1998 amendment by the Executive Director and the General Counsel of the Constitution Revision Commission explained that the amendment revised section 1 by
(1) making education a "fundamental value," (2) making it a paramount duty of the state to make adequate provision for the education of children, and (3) defining "adequate provisions" by requiring that the public school system be "efficient, safe, secure, and high quality."
The "fundamental value" language, new to the constitution, was codified from the language taken from the Florida *404 Supreme Court decision in Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400 (Fla.1996). Early proposals presented before the Constitution Revision Commission framed education in terms of being a "fundamental right." In response to concerns of commissioners that the state might become liable for every individual's dissatisfaction with the education system, the term "fundamental value" was substituted.
The "paramount duty" language represents a return to the 1868 Constitution, which provided that "[i]t is the paramount duty of the State to make ample provisions for the education of all children residing within its borders, without distinction or preference.". . . .
The addition of "efficient, safe, secure, and high quality" represents an attempt by the 1997-98 Constitution Revision Commission to provide constitutional standards to measure the "adequacy" provision found in the second sentence of section 1. The action of the commission was in direct response to recent court actions seeking a declaration that Article IX, section 1 created a fundamental right to an adequate education, which the state had arguably violated by failing to provide sufficient resources to public education.
William A. Buzzett and Deborah K. Kearney, Commentary, art. IX, § 1, 26A Fla. Stat. Annot. (West Supp.2006) (first alteration in original).
In reviewing article IX, section 1 in Coalition for Adequacy & Fairness, the Court recognized a four-category system for analyzing state education clauses to ascertain the level of duty imposed on the state legislature by language in the Constitution:
[A] Category I clause merely requires that a system of "free public schools" be provided. A Category II clause imposes some minimum standard of quality that the State must provide. A Category III clause requires "stronger and more specific education mandate[s] and purpose preambles." And, a Category IV clause imposes a maximum duty on the State to provide for education. Barbara J. Staros, School Finance Litigation in Florida: A Historical Analysis, 23 Stetson L.Rev. 497, 498-99 (1994). Using this rating system, Florida's education clause in 1868 imposed a Category IV duty on the legislature  a maximum duty on the State to provide for education. In addition, it also imposed a duty on the legislature to provide for a uniform system of education.
680 So.2d at 405 n. 7. After the 1998 revision restoring the "paramount duty" language, Florida's education article is again classified as a Category IV clause, imposing a maximum duty on the state to provide for public education that is uniform and of high quality.
Continuing concern over the quality of the education provided by the public schools led the citizens of this state to adopt a constitutional amendment in 2002 mandating maximum class sizes. See art. IX, § 1(a), Fla. Const.; Advisory Opinion to Attorney Gen. re Florida's Amendment to Reduce Class Size, 816 So.2d 580, 586 (Fla.2002) (approving the proposed amendment for placement on the ballot).[9] In this same election, the citizens of this state also approved a constitutional amendment requiring the state to provide "a high quality pre-kindergarten learning opportunity." *405 Art. IX, § 1(b)-(c), Fla. Const.; see also Advisory Opinion to Attorney Gen. re Voluntary Universal Pre-Kindergarten Education, 824 So.2d 161, 167 (Fla.2002) (approving the proposed amendment for placement on the ballot).

III. Constitutionality of the Opportunity Scholarship Program
In our review of the constitutionality of the OSP, "[t]he political motivations of the legislature, if any, in enacting [this legislation] are not a proper matter of inquiry for this Court. We are limited to measuring the Act against the dictates of the Constitution." School Bd. of Escambia County v. State, 353 So.2d 834, 839 (Fla.1977). We are also mindful that statutes come to the Court "clothed with a presumption of constitutionality," City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002) (quoting Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 881 (Fla.1983)), and that the Court should give a statute a constitutional construction where such a construction is reasonably possible. See Tyne v. Time Warner Entertainment Co., 901 So.2d 802, 810 (Fla.2005). However, in this case we conclude that the OSP is in direct conflict with the mandate in article IX, section 1(a) that it is the state's "paramount duty" to make adequate provision for education and that the manner in which this mandate must be carried out is "by law for a uniform, efficient, safe, secure, and high quality system of free public schools."

A. The State's Obligation Under Article IX, Section 1(a)
This Court has long recognized the constitutional obligation that Florida's education article places upon the Legislature:
Article XII, section 1, constitution [the predecessor to article IX, section 1] commands that the Legislature shall provide for a uniform system of public free schools and for the liberal maintenance of such system of free schools. This means that a system of public free schools ... shall be established upon principles that are of uniform operation throughout the State and that such system shall be liberally maintained.
State ex rel. Clark v. Henderson, 137 Fla. 666, 188 So. 351, 352 (1939). Currently, article IX, section 1(a), which is stronger than the provision discussed in Henderson, contains three critical components with regard to public education. The provision (1) declares that the "education of children is a fundamental value of the people of the State of Florida," (2) sets forth an education mandate that provides that it is "a paramount duty of the state to make adequate provision for the education of all children residing within its borders," and (3) sets forth how the state is to carry out this education mandate, specifically, that "[a]dequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools." (Emphasis supplied.)
Justice Overton explained in his concurring opinion in Coalition for Adequacy & Fairness that "[t]his education provision was placed in our constitution in recognition of the fact that education is absolutely essential to a free society under our governmental structure." 680 So.2d at 409. Justice Overton also noted that
[t]he authors of our United States Constitution and our general governmental structure have acknowledged the importance of education as well. As James Madison said:
Knowledge will forever govern ignorance; and a people who mean to be their own governours must arm themselves with the power that knowledge gives.... Learned institutions ought to be favorite objects with every free *406 people. They throw that light over the public mind which is the best security against crafty and dangerous encroachments on the public liberty.
Robert S. Peck, The Constitution and American Values, in The Blessings of Liberty: Bicentennial Lectures At The National Archives 133 (Robert S. Peck & Ralph S. Pollock eds., 1989). Thomas Jefferson said it even more succinctly: "If a nation expects to be ignorant and free ... it expects what never was and never will be." Letter from Thomas Jefferson to Colonel Charles Yancey (Jan. 6, 1816). Further, in one of the most important cases ever decided by the United States Supreme Court, Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954), the Court stated that education is important "to our democratic society. It is required in the performance of our most basic public responsibilities.... It is the very foundation of good citizenship."
Id. (alterations in original).

B. Article IX, Section 1(a): A Mandate With a Restriction
In the 1999 legislation creating the OSP, the Legislature recognized its heightened obligation regarding public education imposed by the 1998 amendment to article IX, section 1:
(1) FINDINGS AND INTENT.  ...
The Legislature recognizes that the voters of the State of Florida, in the November 1998 general election, amended s. 1, Art. IX of the Florida Constitution so as to make education a paramount duty of the state. The Legislature finds that the State Constitution requires the state to provide the opportunity to obtain a high-quality education.
§ 229.0537(1), Fla. Stat. (1999). In 2002 legislation that renumbered the statutory provisions dealing with education, the Legislature made essentially the same finding in language that more closely tracked the language of article IX, section 1(a):
The Legislature finds that the State Constitution requires the state to provide a uniform, safe, secure, efficient, and high-quality system which allows the opportunity to obtain a high-quality education.
§ 1002.38(1), Fla. Stat. (2005). Although these statements purport to fulfill the constitutional mandate, the legislative findings omit critical language in the constitutional provision. In neither the 1999 nor the 2002 version of the OSP legislation is there an acknowledgment by the Legislature that the state's constitutional obligation under article IX, section 1(a) is to provide a "uniform, efficient, safe, secure, and high quality system of free public schools." (Emphasis supplied.)
The constitutional language omitted from the legislative findings is crucial. This language acts as a limitation on legislative power. See generally Savage v. Bd. of Pub. Instruction, 101 Fla. 1362, 133 So. 341, 344 (1931) ("The Constitution of this state is not a grant of power to the Legislature, but a limitation only upon legislative power. . . ."). Absent a constitutional limitation, the Legislature's "discretion reasonably exercised is the sole brake on the enactment of legislation." State v. Bd. of Pub. Instruction, 126 Fla. 142, 170 So. 602, 606 (1936).
Article IX, section 1(a) is a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate. The second and third sentences must be read in pari materia, rather than as distinct and unrelated obligations. This principle of *407 statutory construction is equally applicable to constitutional provisions. As we stated in construing a different constitutional amendment, the provision should "be construed as a whole in order to ascertain the general purpose and meaning of each part; each subsection, sentence, and clause must be read in light of the others to form a congruous whole." Dep't of Envtl. Prot. v. Millender, 666 So.2d 882, 886 (Fla.1996); see also Physicians Healthcare Plans, Inc. v. Pfeifler, 846 So.2d 1129, 1134 (Fla.2003).
The second sentence of article IX, section 1(a) provides that it is the "paramount duty of the state to make adequate provision for the education of all children residing within its borders." The third sentence of article IX, section 1(a) provides a restriction on the exercise of this mandate by specifying that the adequate provision required in the second sentence "shall be made by law for a uniform, efficient, safe, secure and high quality system of free public schools." (Emphasis supplied.) The OSP violates this provision by devoting the state's resources to the education of children within our state through means other than a system of free public schools.[10]
The principle of construction, "expressio unius est exclusio alterius," or "the expression of one thing implies the exclusion of another," leads us to the same conclusion. This Court has stated:
[W]here the Constitution expressly provides the manner of doing a thing, it impliedly forbids its being done in a substantially different manner. Even though the Constitution does not in terms prohibit the doing of a thing in another manner, the fact that it has prescribed the manner in which the thing shall be done is itself a prohibition against a different manner of doing it. Therefore, when the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive, and it is beyond the power of the Legislature to enact a statute that would defeat the purpose of the constitutional provision.
Weinberger v. Bd. of Pub. Instruction, 93 Fla. 470, 112 So. 253, 256 (1927) (citations omitted); see also S & J Transp., Inc. v. Gordon, 176 So.2d 69, 71 (Fla.1965) (providing that "where one method or means of exercising a power is prescribed in a constitution it excludes its exercise in other ways"). We agree with the trial court that article IX, section 1(a) "mandates that a system of free public schools is the manner in which the State is to provide a free education to the children of Florida" and that "providing a free education ... by paying tuition ... to attend private schools is a `a substantially different manner' of providing a publicly funded education than... the one prescribed by the Constitution." Holmes v. Bush, No. CV99-3370 at 10, 2000 WL 526364 (2nd Cir. Ct. order filed March 14, 2000) (citation omitted).
In reaching this conclusion, we distinguish Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 882 (1944), in which the Court declined to apply the "expressio unius est exclusio alterius" maxim based on its determination that the statute at issue did *408 not conflict with the primary purpose of the relevant constitutional provision. In Taylor, the Court considered whether a law that allowed married women to manage and control their separate property by, inter alia, suing or being sued over the property conflicted with a constitutional provision allowing a married woman's separate property to be charged in equity to satisfy claims related to that property. See id. at 880. The Court concluded that "it was not the primary purpose of [the constitutional provision] to effect the adjudication in equity of all claims against married women, but to require positive action on the part of the legislature to insure enforcement in equity against their separate property of claims having equitable qualities because they represented money traceable into the property." Id. at 882. Unlike the constitutional provision at issue in Taylor, which had a narrow primary purpose, article IX, section 1(a) provides a comprehensive statement of the state's responsibilities regarding the education of its children.
The dissent considers our use of rules of construction such as "in pari materia" and "expressio unius" unnecessary to discern the meaning of a provision that the dissent considers clear and unambiguous. "Ambiguity suggests that reasonable persons can find different meanings in the same language." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992). It is precisely because the amendment is not clear and unambiguous regarding public funding of private schools that we look to accepted standards of construction applicable to constitutional provisions. See Joshua v. City of Gainesville, 768 So.2d 432, 435 (Fla.2000) (stating that "if the language of the statute is unclear, then rules of statutory construction control"); Zingale, 885 So.2d at 282, 285 (applying rules of statutory construction, including "in pari materia," to constitutional provisions); Caribbean Conservation Corp. v. Florida Fish & Wildlife Conservation Comm'n, 838 So.2d 492, 501 (Fla.2003) (same). "In pari materia" and "expressio unius" are objective principles to apply in our analysis.
Although parents certainly have the right to choose how to educate their children,[11] article IX, section (1)(a) does not, as the Attorney General asserts, establish a "floor" of what the state can do to provide for the education of Florida's children. The provision mandates that the state's obligation is to provide for the education of Florida's children, specifies that the manner of fulfilling this obligation is by providing a uniform, high quality system of free public education, and does not authorize additional equivalent alternatives.

C. Diversion of Funds from the Public Schools
The Constitution prohibits the state from using public monies to fund a private alternative to the public school system, which is what the OSP does. Specifically, the OSP transfers tax money earmarked for public education to private schools that provide the same service  basic primary education. Thus, contrary to the defendants' arguments, the OSP does not supplement the public education system. Instead, the OSP diverts funds *409 that would otherwise be provided to the system of free public schools that is the exclusive means set out in the Constitution for the Legislature to make adequate provision for the education of children.
Section 1002.38(6)(f), Florida Statutes (2005), specifically requires the Department of Education to "transfer from each school district's appropriated funds the calculated amount from the Florida Education Finance Program and authorized categorical accounts to a separate account for the Opportunity Scholarship Program." Even if the tuition paid to the private school is less than the amount transferred from the school district's funds and therefore does not result in a dollar-for-dollar reduction, as the dissent asserts, it is of no significance to the constitutionality of public funding of private schools as a means to making adequate provision for the education of children.
Although opportunity scholarships are not now widely in use, if the dissent is correct as to their constitutionality, the potential scale of programs of this nature is unlimited. Under the dissent's view of the Legislature's authority in this area, the state could fund a private school system of indefinite size and scope as long as the state also continued to fund the public schools at a level that kept them "uniform, efficient, safe, secure, and high quality." However, because voucher payments reduce funding for the public education system, the OSP by its very nature undermines the system of "high quality" free public schools that are the sole authorized means of fulfilling the constitutional mandate to provide for the education of all children residing in Florida.[12] The systematic diversion of public funds to private schools on either a small or large scale is incompatible with article IX, section 1(a).

D. Exemption from Public School Uniformity
In addition to specifying that a system of free public schools is the means for complying with the mandate to provide for the education of Florida's children, article IX, section 1(a) also requires that this system be "uniform." The OSP makes no provision to ensure that the private school alternative to the public school system meets the criterion of uniformity. In fact, in a provision directing the Department of Education to establish and maintain a database of private schools, the Legislature expressly states that it does not intend "to regulate, control, approve, or accredit private educational institutions." § 1002.42(2)(h), Fla. Stat. (2005). This lack of oversight is also evident in section 1001.21, which creates the Office of Private Schools and Home Education Programs within the Department of Education but provides that this office "ha[s] no authority over the institutions or students served." § 1001.21(1), Fla. Stat. (2005).
Further, although the parent of a student participating in the OSP must ensure that the student "takes all statewide assessments" required of a public school student, § 1002.38(5)(c), the private school's curriculum and teachers are not subject to the same standards as those in force in public schools. For example, only teachers possessing bachelor's degrees are eligible to teach at public schools, but private *410 schools may hire teachers without bachelor's degrees if they have "at least 3 years of teaching experience in public or private schools, or have special skills, knowledge, or expertise that qualifies them to provide instruction in subjects taught." § 1002.38(4)(g), Fla. Stat. (2005).
In addition, public school teachers must be certified by the state. See § 1012.55(1), Fla. Stat. (2005). To obtain this certification, teachers must meet certain requirements that include having "attained at least a 2.5 overall grade point average on a 4.0 scale in the applicant's major field of study" and having demonstrated a mastery of general knowledge, subject area knowledge, and professional preparation and education competence. See § 1012.56(2)(c), (g)-(i), Fla. Stat. (2005).
Public teacher certification also requires the applicant to submit to a background screening. See § 1012.56(2)(d), Fla. Stat. (2005). Indeed, all school district personnel hired to fill positions that require direct contact with students must undergo a background check. See § 1012.32(2)(a), Fla. Stat. (2005). This screening is not required of private school employees. See § 1002.42(2)(c)(3), Fla. Stat. (2005) (providing that owners of private schools may require employees to file fingerprints with the Department of Law Enforcement).
Regarding curriculum, public education instruction is based on the "Sunshine State Standards" that have been "adopted by the State Board of Education and delineate the academic achievement of students, for which the state will hold schools accountable." § 1003.41, Fla. Stat. (2005). Public schools are required to teach all basic subjects as well as a number of other diverse subjects, among them the contents of the Declaration of Independence, the essentials of the United States Constitution, the elements of civil government, Florida state history, African-American history, the history of the Holocaust, and the study of Hispanic and women's contributions to the United States. See § 1003.42(2)(a), Fla. Stat. (2005). Eligible private schools are not required to teach any of these subjects.
In addition to being "academically accountable to the parent," a private school participating in the OSP is subject only "to the ... curriculum ... criteria adopted by an appropriate nonpublic school accrediting body." § 1002.38(4)(f), Fla. Stat. (2005). There are numerous nonpublic school accrediting bodies that have "widely variant quality standards and program requirements." Florida Department of Education, Private School Accreditation, http://www.floridaschoolchoice.org/Information/Private-Schools/ accreditation.asp (last visited Jan. 3, 2005). Thus, curriculum standards of eligible private schools may vary greatly depending on the accrediting body, and these standards may not be equivalent to those required for Florida public schools.
In all these respects, the alternative system of private schools funded by the OSP cannot be deemed uniform in accordance with the mandate in article IX, section 1(a).

E. Other Provisions of Article IX
Reinforcing our determination that the state's use of public funds to support an alternative system of education is in violation of article IX, section 1(a) is the limitation of the use of monies from the State School Fund set forth in article IX, section 6. That provision states that income and interest from the State School Fund may be appropriated "only to the support and maintenance of free public schools." Art. IX, § 6, Fla. Const. It is well established that "[e]very provision of *411 [the constitution] was inserted with a definite purpose and all sections and provisions of it must be construed together, that is, in pari materia, in order to determine its meaning, effect, restraints, and prohibitions." Thomas v. State ex rel. Cobb, 58 So.2d 173, 174 (Fla.1952); see also Caribbean Conservation Corp., 838 So.2d at 501 ("[I]n construing multiple constitutional provisions addressing a similar subject, the provisions `must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision.'") (quoting Advisory Opinion to the Governor-1996 Amendment 5 (Everglades), 706 So.2d 278, 281 (Fla.1997)). Reading sections 1(a) and 6 of article IX in pari materia evinces the clear intent that public funds be used to support the public school system, not to support a duplicative, competitive private system.
Further, in reading article IX as a whole, we note the clear difference between the language of section 1(a) and that of section 1(b), which was adopted in 2002 and provides in full:
Every four-year old child in Florida shall be provided by the State a high quality pre-kindergarten learning opportunity in the form of an early childhood development and education program which shall be voluntary, high quality, free, and delivered according to professionally accepted standards. An early childhood development and education program means an organized program designed to address and enhance each child's ability to make age appropriate progress in an appropriate range of settings in the development of language and cognitive capabilities and emotional, social, regulatory and moral capacities through education in basic skills and such other skills as the Legislature may determine to be appropriate.
(Emphasis supplied.) Although this provision requires that the pre-kindergarten learning opportunity must be free and delivered according to professionally accepted standards, noticeably absent is a requirement that the state provide this opportunity by a particular means. Thus, in contrast to the Legislature's obligation under section 1(a) to make adequate provision for kindergarten through grade twelve education through a system of free public schools, the Legislature is free under section 1(b) to provide for pre-kindergarten education in any manner it desires, consistent with other applicable constitutional provisions.
We reject the argument that the OSP falls within the state's responsibility under article IX, section 1(a) to make "[a]dequate provision ... for ... other public education programs that the needs of the people may require." As this Court explained in Board of Public Instruction, the reference to "other public education programs" added in 1968 "obviously applies to the existing systems of junior colleges, adult education, etc., which are not strictly within the general conception of free public schools or institutions of higher learning." 231 So.2d at 2. The OSP is limited to kindergarten through grade twelve education.

F. Other Programs Unaffected
The OSP is distinguishable from the program at issue in Scavella v. School Board of Dade County, 363 So.2d 1095 (Fla.1978), under which exceptional students could attend "private schools because of the lack of special services" in their school district. Id. at 1097 (emphasis supplied). The program allowed a school board to use state funds to pay for a private school education if the public school did "not have the special facilities or instructional personnel to provide an *412 adequate educational opportunity" for certain exceptional students, specifically physically disabled students. See id. at 1098 (emphasis supplied). Further, it was not the program itself that was challenged in Scavella but a subsequent amendment to the program that placed a cap on the amount of money a school district could pay to a private institution. See id. at 1097. The issue was whether the cap violated the students' right to equal protection under article I, section 2, Florida Constitution, which expressly provided that "[n]o person shall be deprived of any right because of ... physical handicap." See id. at 1097.[13] The Court held that "the statute requires the school districts to establish a maximum amount that would not deprive any student of a right to a free education," and that so interpreted the statute did "not deny anyone of equal protection before the law." Id. at 1099. We conclude that the First District erred in relying on Scavella to support its determination that the OSP does not violate article IX, section 1(a).[14]
We reject the suggestion by the State and amici that other publicly funded educational and welfare programs would necessarily be affected by our decision. Other educational programs, such as the program for exceptional students at issue in Scavella, are structurally different from the OSP, which provides a systematic private school alternative to the public school system mandated by our constitution. Nor are public welfare programs implicated by our decision, which rests solely on our interpretation of the provisions of article IX, the education article of the Florida Constitution. Other legislatively authorized programs may also be distinguishable in ways not fully explored or readily apparent at this stage. The effect of our decision on those programs would be mere speculation.

CONCLUSION
In sum, article IX, section 1(a) provides for the manner in which the state is to fulfill its mandate to make adequate provision for the education of Florida's children  through a system of public education. The OSP contravenes this constitutional provision because it allows some children to receive a publicly funded education through an alternative system of private schools that are not subject to the uniformity requirements of the public school system. The diversion of money not only reduces public funds for a public education but also uses public funds to provide an alternative education in private schools that are not subject to the "uniformity" requirements for public schools. Thus, in two significant respects, the OSP violates the mandate set forth in article IX, section 1(a).
We do not question the basic right of parents to educate their children as they see fit. We recognize that the proponents of vouchers have a strongly held view that students should have choices. Our decision does not deny parents recourse to either public or private school alternatives to a failing school. Only when the private school option depends upon public funding is choice limited. This limit is necessitated by the constitutional mandate in article IX, *413 section 1(a), which sets out the state's responsibilities in a manner that does not allow the use of state monies to fund a private school education. As we recently explained, "[w]hat is in the Constitution always must prevail over emotion. Our oaths as judges require that this principle is our polestar, and it alone." Bush v. Schiavo, 885 So.2d 321, 336 (Fla.2004).
Because we conclude that section 1002.38 violates article IX, section 1(a) of the Florida Constitution, we disapprove the First District's decision in Holmes I. We affirm the First District's decision finding section 1002.38 unconstitutional in Holmes II, but neither approve nor disapprove the First District's determination that the OSP violates the "no aid" provision in article I, section 3 of the Florida Constitution, an issue we decline to reach. In order not to disrupt the education of students who are receiving vouchers for the current school year, our decision shall have prospective application to commence at the conclusion of the current school year.
It is so ordered.
WELLS, ANSTEAD, LEWIS, and QUINCE, concur.
BELL, J., dissents with an opinion, in which CANTERO, J., concurs.
BELL, J., dissenting.
"[N]othing in article IX, section 1 clearly prohibits the Legislature from allowing the well-delineated use of public funds for private school education, particularly in circumstances where the Legislature finds such use is necessary." Bush v. Holmes, 767 So.2d 668, 675 (Fla. 1st DCA 2000) (footnote omitted). This conclusion, written by Judge Charles Kahn for a unanimous panel of the First District Court of Appeal, is the only answer this Court is empowered to give to the constitutional question the majority has decided to answer. Therefore, I dissent.
In its construction of this constitutional provision, the majority asserts that it "follow[s] principles parallel to those guiding statutory construction," yet its reasoning fails to adhere to the most fundamental of these principles. Majority op. at 400. It fails to evince any presumption that the OSP is constitutional or any effort to resolve every doubt in favor of its constitutionality. Therefore, I begin this dissent by stating the fundamental principles that should direct any determination of whether the OSP violates article IX, section 1. Next, I address the text of article IX, section 1. I will show that this text is plain and unambiguous. Because article IX is unambiguous, it needs no interpretation, and it is inappropriate to use maxims of statutory construction to justify an exclusivity not in the text. Finally, I find no record support for the majority's presumption that the OSP prevents the State from fulfilling its mandate to make adequate provision for a uniform system of free public schools.

I. Fundamental Principles of State Constitutional Jurisprudence
This Court has long proclaimed that courts "have the power to declare laws unconstitutional only as a matter of imperative and unavoidable necessity," State ex rel. Crim v. Juvenal, 118 Fla. 487, 159 So. 663, 664 (1935), and are "bound `to resolve all doubts as to the validity of [a] statute in favor of its constitutionality, provided the statute may be given a fair construction that is consistent with the federal and state constitutions as well as with the legislative intent.'" Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 51 (Fla.2000) (quoting State v. Stalder, 630 So.2d 1072, 1076 (Fla.1994)). Indeed, "[w]hen a legislative enactment is challenged the court should be liberal in its interpretation; every *414 doubt should be resolved in favor of the constitutionality of the law, and the law should not be held invalid unless clearly unconstitutional beyond a reasonable doubt." Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 882 (1944).
This judicial deference to duly enacted legislation is derived from three "first principles" of state constitutional jurisprudence. First, the people are the ultimate sovereign. Rivera-Cruz v. Gray, 104 So.2d 501, 506 (Fla.1958) (Terrell, C.J., concurring) (recognizing that "[t]he Constitution is the people's document.... As said by George Mason in the Virginia Declaration of Rights, adopted June 12, 1776:... `all power is vested in, and consequently derived from, the people; [therefore,] [m]agistrates are their trustees and servants, and at all times amenable to them'"). Second, unlike the federal constitution, our state constitution is a limitation upon the power of government rather than a grant of that power. Chiles v. Phelps, 714 So.2d 453, 458 (Fla.1998) (citing Savage v. Board of Public Instruction, 101 Fla. 1362, 133 So. 341, 344 (1931), for the proposition that "[t]he Constitution of this state is not a grant of power to the Legislature, but a limitation only upon legislative power, and unless legislation be clearly contrary to some express or necessarily implied prohibition found in the Constitution, the courts are without authority to declare legislative [a]cts invalid"). This means that the Legislature has general legislative or policy-making power over such issues as the education of Florida's children except as those powers are specifically limited by the constitution. Id. (recognizing that "[t]he legislature's power is inherent, though it may be limited by the constitution"); see also State ex rel. Green v. Pearson, 153 Fla. 314, 14 So.2d 565, 567 (1943) ("It is a familiarly accepted doctrine of constitutional law that the power of the Legislature is inherent.... The legislative branch looks to the Constitution not for sources of power but for limitations upon power."). Third, because general legislative or policy-making power is vested in the legislature, the power of judicial review over legislative enactments is strictly limited. Specifically, when a legislative enactment is challenged under the state constitution, courts are without authority to invalidate the enactment unless it is clearly contrary to an express or necessarily implied prohibition within the constitution. Chapman v. Reddick, 41 Fla. 120, 25 So. 673, 677 (1899) ("[U]nless legislation duly passed be clearly contrary to some express or implied prohibition contained [in the constitution], the courts have no authority to pronounce it invalid.").
Because of these three "first principles," statutes like the OSP come to courts with a strong presumption of constitutionality. State v. Jefferson, 758 So.2d 661, 664 (Fla. 2000) ("[w]henever possible, statutes should be construed in such a manner so as to avoid an unconstitutional result"); see also State ex rel. Shevin v. Metz Const. Co., Inc., 285 So.2d 598, 600 (Fla.1973) ("It is elementary that a statute is clothed with a presumption of constitutional validity"). And, as we will see from the text of article IX, section 1, when read in light of these fundamental principles, the OSP does not violate any express or necessarily implied provision of article IX, section 1(a) of the Florida Constitution.

II. Article IX, Section 1 and the OSP
The text of article IX, section 1 is plain and unambiguous. In its third sentence, it clearly mandates that the State make adequate provision for a system of free public schools. But, contrary to the majority's conclusion, it does not preclude the Legislature from using its general legislative powers to provide a private school scholarship to a finite number of parents who *415 have a child in one of Florida's relatively few "failing" public schools.[15] Even if the text of article IX, section 1 could be considered ambiguous on this issue, there is absolutely no evidence that the voters or drafters ever intended any such proscription. Given these irrefutable facts, it is wholly inappropriate for a court to use a statutory maxim such as expressio unius est exclusio alterius to imply such a proscription.

A. The Plain Meaning of Article IX, Section 1
The relevant portion of article IX, section 1 of the Florida Constitution provides in part:
Section 1. Public education. 
(a) The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
The majority finds an exclusivity requirement in this provision that is neither expressed in the text nor necessarily implied. Specifically, the majority states that the public school system is "the exclusive means set out in the constitution for the Legislature to make adequate provision for the education of children." Majority op. at 409. It reads article IX, section 1(a) as "a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." Majority op. at 406. Therefore, the majority concludes that "[t]he OSP violates [article IX, section 1] by devoting the state's resources to the education of children within our state through means other than a system of free public schools." Majority op. at 407.
The majority's reading of article IX, section 1 is flawed. There is no language of exclusion in the text. Nothing in either the second or third sentence of article IX, section 1 requires that public schools be the sole means by which the State fulfills its duty to provide for the education of children. And there is no basis to imply such a proscription.
The meaning of this clause, especially if read in light of the presumptions and "first principles" discussed above, is plain. The people of Florida declare in the first sentence that they consider the education of children a core value. In the second sentence, they establish that it is a primary duty of their government to see that this value is fulfilled. These two sentences state:

*416 The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders.
Having laid this foundation, the people specify exactly what they demand of their government in regards to this duty to make adequate provision for the education of Florida's children. They specify three things; however, only the first mandate is at issue in this case.[16] This first mandate requires the Legislature to make adequate provision by law for a system of free public schools, institutions of higher learning and other educational programs. Specifically, the mandate states:
Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
(Emphasis added.) This mandate is to make adequate provision for a public school system. The text does not provide that the government's provision for education shall be "by" or "through" a system of free public schools. Without language of exclusion or preclusion, there is no support for the majority's finding that public schools are the exclusive means by or through which the government may fulfill its duty to make adequate provision for the education of every child in Florida.
As the ultimate sovereign, if the people of Florida had wanted to mandate this exclusivity, they could have very easily written article IX to include such a proscription. Ten other states have constitutional provisions that expressly prohibit the allocation of public education funds to private schools.[17]Compare art. IX, Fla. Const., with, e.g., Miss. Const. art. 8, § 208 ("[N]or shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school."), and S.C. Const. art. XI, § 4 ("No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution."). However, the people of Florida have not included such a proscription in article IX, section 1 of the Florida Constitution. Therefore, without any express or necessarily implied proscription in article IX, section 1 of Florida's Constitution, this Court has no authority to declare the OSP unconstitutional as violative of article IX, section 1.[18]

*417 B. The History of Article IX: Discerning the Voters' and Drafters' Intent
Because the plain language of article IX, section 1 is wholly sufficient to conclude that this provision does not prohibit a program such as the OSP, it is unnecessary and improper to go beyond the text by citing to the intent of the voters and drafters.[19] However, I include it here because the majority asserts that article IX, section 1 is "not clear and unambiguous regarding public funding of private schools," majority op. at 408, and a majority of this Court has found legislative history persuasive in the pastat least in regard to statutory interpretation. See Am. Home Assur. Co. v. Plaza Materials Corp., 908 So.2d 360 (Fla.2005). Moreover, the history of article IX helps to highlight why the majority's use of the expressio unius maxim, in particular, is improper because this history provides no support for the majority's implied exclusivity.

1. The 1998 Amendments to Article IX, Section 1
My criticism of the majority's interpretation of article IX, section 1 is confirmed by looking at how the amendments to article IX were presented to the voters in 1998. Consistent with the plain meaning of the text, the ballot summary reveals that: (1) the first sentence was added as a declaration of the value of education; (2) the second sentence was added to "establish adequate provision for education as a paramount duty of the state"; and (3) the third sentence was modified to expand the terms of the existing mandate relative to public schools. Nowhere in this ballot summary were the voters informed that by adopting the amendments, they would be mandating that the public school system would become the exclusive means by which the State could fulfill its duty to provide for education.
The full text of the 1998 ballot proposal read as follows (deleted words are stricken and added language is underlined):

ARTICLE IX

EDUCATION
SECTION 1. System of Public education.  The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
*418 The ballot summary explained these amendments to the voters in this way:
BALLOT SUMMARY
Declares the education of children to be a fundamental value to the people of Florida; establishes adequate provision for education as a paramount duty of the state; expands constitutional mandate requiring the state to make adequate provision for a uniform system of free public schools by also requiring the state to make adequate provision for an efficient, safe, secure and high quality system.
Significantly, the only reference to a mandate in the ballot summary is in regard to the preexisting third sentence, and this reference only speaks of "expand[ing] the constitutional mandate requiring the State to make adequate provision for" the public school system. It does not refer to the second sentence as a mandate. And it certainly does not describe this amendment as mandating that the public school system be the exclusive means for carrying out the State's duty to provide education under article IX, section 1.

2. The Constitution Revision Commission
The majority will also find no support for its interpretation of article IX, section 1 in the history behind the drafting of the 1998 amendments. There is no evidence that this clause was intended to place "a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." Majority op. at 406. Instead, the evidence from the 1997-98 Constitution Revision Commission supports the textual understanding I described above.
According to a prominent member of this Commission, the sole purpose for amending article IX, section 1 was to emphasize the importance of education and to provide a standard for defining "adequate provision." Jon Mills & Timothy McClendon, Setting a New Standard for Public Education: Revision 6 Increases the Duty of the State to Make "Adequate Provision" for Florida Schools, 52 Fla. L.Rev. 329, 331 (2000) (stating that "The Constitution Revision Commission's clear goal [when revising article IX] was to increase the state's constitutional duty and raise the constitutional standard for adequate education, and in fact to make the standard high quality"). There was no intent to make public schools the exclusive manner by which the Legislature could make provision for educating children.
A review of the minutes of the meetings of the Commission reveals a finding that a proposal to preclude educational vouchers was actually presented to the Commission by the public, but never accepted. When the Constitution Revision Commission convened to draft the language for the 1998 amendments, the issue of whether the state should be allowed to fund education at private schools was clearly before them. The debate over education vouchers had been a matter of nationwide public debate since at least the early 1990s. For example, in 1992 the Wisconsin Supreme Court upheld a program similar to the OSP under an education article that also required the state legislature to provide by law for the establishment of a uniform public school system.[20]Davis v. Grover, 166 *419 Wis.2d 501, 480 N.W.2d 460 (1992). And opportunity scholarships were a central part of Florida's hotly contested 1998 gubernatorial campaign. Peter Wallsten & Tim Nickens, Governor's Race is Set; Education is the Issue, St. Petersburg Times, July 7, 1998, at 1A, available at http:// www.sptimes.com (search Archives for "governor's race is set"). Indeed, the citizens of Florida raised this very issue at the Commission's public hearings. Some citizens requested that the amended article IX expressly authorize vouchers or increase school choice, while others requested that article IX expressly prohibit vouchers. See, e.g., Florida Constitution Revision Commission, Meeting Proceedings July 30, 1997, Gainesville Public Hearing Minutes, Remarks of Cynthia Moore Chestnut, http://www.law.fsu. edu/crc/minutes.html ("Opposes vouchers allowing for the taking of public school dollars to pay for private school"); id., Remarks of Brian Lyons ("Favors educational vouchers; school choice."); Florida Constitution Revision Commission, Meeting Proceedings for August 21, 1997, Minutes, Remarks of Charlotte Greenbarg, http://www.law.fsu. edu/crc/minutes.html ("School Choice is too restrictive"); Florida Constitution Revision Commission, Meeting Proceedings for September 4, 1997, Minutes, Remarks of John Book, http://www.law.fsu. edu/crc/minutes.html ("Don't allow vouchers for private schools"). Despite this intense public debate, the Commission offered no amendments related to educational vouchers.
Again, the Commission's goal, as stated by Commissioner Jon Mills, was "to increase the State's constitutional duty and raise the constitutional standard for education." As another commissioner explained:[21]
Now I want to point out clearly and for purposes of intent that as the education of our children in the state move in various directions, whether it be charter schools, private schools, public schools, and whatever preference you have as to how our children are educated, this amendment [to article IX] does not address that.
What this amendment does is says that as we move off in those directions... this amendment is going to ensure everyone moves together, that every child is ensured an education: the poor, the black, the whites, the Asians, the Hispanics. Every one will be ensured this fundamental right, no matter what direction this State takes.
Florida Constitution Revision Commission, Meeting Proceedings for January 15, 1998, Transcript at 265-66, http://www.law.fsu. edu/crc/minutes.html [hereinafter CRC Jan. 15 Transcript] (statement of Commissioner Brochin). A number of other commissioners *420 affirmed this position, voicing their convictions that the amendments to article IX should not limit the Legislature's authority to determine the best method for providing education in Florida. See, e.g., CRC Jan. 15 Transcript at 296-97 (statement of Commissioner Thompson expressing a desire to ensure the Legislature retains the freedom to determine how best to provide education); see also Florida Constitution Revision Commission, Meeting Proceedings for February 26, 1998, at 55, http://www.law.fsu .edu/crc/minutes.html (statement of Commissioner Evans conveying fear that the heightened importance of education in article IX would transfer power from the voters to the courts); see also CRC Jan. 15 Transcript at 269 (statement of Commissioner Langley expressing concern that the heightened importance of education in article IX would transform the Florida Supreme Court into the State Board of Education).

C. The Maxims of Statutory Construction
As established above, there is no textual or historical support for the majority's reading of article IX, section 1 as a prohibition on the Legislature's authority to provide any public funds to private schools. Given this complete absence of textual or historical support, I strongly disagree with the majority's use of maxims of statutory construction to imply such a prohibition. See Holly v. Auld, 450 So.2d 217 (Fla. 1984), where this Court held, "`[w]hen the language of the statute is clear and unambiguous and conveys a definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.'" Id. at 219 (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). In particular, the use of expressio unius in this case significantly expands this Court's case law in a way that illustrates the danger of liberally applying this maxim.
It is generally agreed in courts across this nation that expressio unius is a maxim of statutory construction that should rarely be used when interpreting constitutional provisions and, then, only with great caution. See generally State ex rel. Jackman v. Court of Common Pleas of Cuyahoga County, 9 Ohio St.2d 159, 224 N.E.2d 906, 910 (1967) (recognizing that the expressio unius maxim "should be applied with caution to [constitutional] provisions... relating to the legislative branch of government, since [the maxim] cannot be made to restrict the plenary power of the legislature") (citing 16 C.J.S. Constitutional Law § 21); 16 Am.Jur.2d Constitutional Law § 69 (2005) (stating "the maxim `expressio unius est exclusio alterius' does not apply with the same force to a constitution as to a statute . . ., and it should be used sparingly"); see also, e.g., Reale v. Bd. of Real Estate Appraisers, 880 P.2d 1205, 1213 (Colo.1994) (finding the expressio unius maxim "inapt" when used to imply a limitation in a state constitution because the "powers not specifically limited [in the constitution] are presumptively retained by the people's representatives"); Penrod v. Crowley, 82 Idaho 511, 356 P.2d 73, 80 (1960) (declaring that expressio unius does not apply when interpreting provisions of the state constitution); Baker v. Martin, 330 N.C. 331, 410 S.E.2d 887, 891 (1991) (recognizing that the expressio unius maxim has never been applied to interpret the state constitution because the maxim "flies directly in the face" of the principle that "[a]ll power which is not expressly limited ... in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution").
*421 This Court has employed expressio unius in addressing constitutional questions, but only rarely. As Judge Kahn aptly noted in his 2000 opinion, the question of whether article IX proscribes a program such as the OSP is clearly distinguishable from other cases in which we have applied this maxim:
In Weinberger, and the other cases relied upon by the trial court, . . . the expressio unius principle found its way into the analysis only because the constitution forbade any action other than that specified in the constitution, and the action taken by the Legislature defeated the purpose of the constitutional provision.
In contrast, in this case, nothing in article IX, section 1 clearly prohibits the Legislature from allowing the well-delineated use of public funds for private school education, particularly in circumstances where the Legislature finds such use is necessary.
Bush, 767 So.2d at 674 (citations and footnote omitted). I agree with this analysis. Article IX, section 1 does not forbid the Legislature from enacting a well-delineated program such as the OSP.
In accord with courts across this nation, this Court has long recognized that the expressio unius maxim should not be used to imply a limitation on the Legislature's power unless this limitation is absolutely necessary to carry out the purpose of the constitutional provision. Marasso v. Van Pelt, 77 Fla. 432, 81 So. 529, 530 (1919). We have repeatedly refused to apply this maxim in situations where the statute at issue bore a "real relation to the subject and object" of the constitutional provision, id. at 532, or did not violate the primary purpose behind the constitutional provision. Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 882 (1944). The majority's use of this maxim violates both restrictions.
The principles stated in Marasso and Taylor restricting the application of the expressio unius maxim in constitutional interpretation apply in this case. The OSP bears a "real relation to the subject and object" of article IX. The primary objective of article IX is to ensure that the Legislature makes adequate provision for a public school system. It does not require that this system be the exclusive means. And, as I have said earlier and will elaborate in more detail below, there is no evidence that the OSP prevents the Legislature from making adequate provision for a public school system that is available to every child in Florida. Because it is not absolutely necessary to imply such a limitation upon the Legislature's power in order to carry out the purpose of article IX, section 1, it is improper for this court to use expressio unius as the basis for doing so. Marasso v. Van Pelt, 77 Fla. 432, 81 So. 529, 530 (1919).
Likewise, the majority's reading of article IX, section 1 in pari materia with article IX, section 6 certainly supports the importance of the public school system in this State. However, it does not imply an absolute prohibition against the use of public funds to provide parents with children in a public school that is not properly educating their child with the option of placing that child in a private school. In fact, in the more than 150 years that section 6 has been a part of Florida's Constitution, it has never been interpreted as preventing the State from using public funds to provide education through private schools.[22] Historical records indicate that *422 Florida provided public funds to private schools until, at least, 1917.[23]See, e.g., *423 Thomas Everette Cochran, History of Public-School Education in Florida 25 (1921) (indicating the State provided $3,964 to private academies in 1860); Nita Katharine Pyburn, Documentary History of Education in Florida: 1822-1860 27 (1951) (recognizing that it was relatively common for the State to fund private academies, the "accepted form of secondary education" through general revenues); Richard J. Gabel, Public Funds for Church and Private Schools 638, 639 n. 3 (May 1937) (Ph.D. dissertation, Catholic University of America) (relying on historical documents to find that Florida use public funds to provide private education until at least 1917).[24] In addition, a commentary on the proposed 1958 constitutional revision described the education article as "authoriz[ing] a system of uniform free public schools, and also permit[ting] the legislature to provide assistance for `other non-sectarian schools.'" Manning J. Dauer, The Proposed New Florida Constitution: An Analysis 16 (1958). When the Florida House of Representatives considered language for the 1968 constitution, it rejected a proposal to add a section to article IX that would have limited the Legislature's use of education funds by preventing any state money from going to sectarian schools. See 3 Minutes: Committee of the Whole House, Constitutional Revision 34 (1967) (proposed art. IX, § 7, Fla. Const).[25] Consequently, I can find no justification for the majority's assertion that reading article IX, section 1 in pari materia with article IX, section 6 justifies its conclusion that article IX, section 1 must be interpreted to restrict the Legislature from applying public funds to private schools.

II. No Evidence That the OSP Prevents the Legislature from Fulfilling its Article IX Mandate
Given the fact that neither the text nor the history of article IX supports the majority's reading of this provision as "mandat(ing) that `adequate provision for the education of all children' shall be by a ... system of free public schools," the only other basis for concluding that the OSP violates article IX is to establish that the program prevents the Legislature from fulfilling its duty to make adequate provision by law for the public school system. The majority does not cite, nor can I find, any evidence in the record before us to support such a finding. In this facial challenge to the OSP, there is absolutely no evidence that the Legislature has either failed to make adequate provision for a statewide system of free public schools or *424 that this system is not available to every child in Florida.
To support its position, the majority critiques the Legislature's failure to recognize its duty to provide a system of free public schools in the statute authorizing the OSP. Majority op. at 406-07. While the Legislature may not have recited the language of article IX verbatim in the statute authorizing the OSP, I find no competent, substantial evidence that the OSP was enacted to somehow escape article IX's mandate to make adequate provision for a system of free public schools, or that this program, in fact, results in an inadequate provision by law for the public school system.
Indeed, the statute authorizing the OSP presents the public school system as the first option for parents with children in a public school that has twice failed to meet the Legislature's educational standards. § 1002.38, Fla. Stat. (2004). It requires school districts to notify parents whose children attend a school qualifying for an opportunity scholarship of the right to attend a higher-performing public school either within or outside of their district. §§ 1002.38(3)(a)(2), 1002.38(3)(b), Fla. Stat. (2004). In addition, the legislative history surrounding the OSP indicates that the purpose behind the program was to improve the public school system by increasing accountability in education. See, e.g., ch. 99-398, Laws of Fla. (1999) (implementing the OSP by creating section 229.0537; amending section 229.591, Florida Statutes (1999), to recognize that the purpose of school improvements was to require the state to provide additional assistance to "D" or "F" schools; and amending section 230.23(16)(3), Florida Statutes (1999), to require school boards to provide assistance to schools that either failed or were in danger of failing). In fact, around the time the OSP was enacted, the Senate rejected a bill authorizing a pilot program that would have provided education vouchers without regard to the public school's performance. See Fla. SB 100 (1999).
Moreover, there is absolutely no evidence that the OSP prevents the Legislature from making adequate provision for a public school system. Opportunity scholarships are available on a very limited basisonly to students whose public school has repeatedly failed to meet the Legislature's minimum standard for a "high quality education." While the scholarships are taken from public moneys allocated to public education, the amount of money removed from the public schools is not a dollar-for-dollar reduction because the opportunity scholarships are capped at the nonpublic school's tuition. On average, this is apparently less than the per-pupil allocation to public schools. SchoolChoiceInfo.Org, Florida Voucher Program: Cost & Fiscal Implications, http:// www.school choiceinfo.org (follow "School Choice Facts" hyperlink, then "Florida", then "Cost and Fiscal Impact") (Aug. 16, 2005). Furthermore, the program is part of a broader education initiative that provides additional assistance to failing schools. Schools that receive an "F" must file school improvement plans, and studies show that these schools actually receive, on average, $800 more in per-pupil funding than "A" schools, even after accounting for the financial rewards given to high performing schools. Governor's Office Initiatives: A + Plan, Opportunity Scholarships, http://www.myflorida .com/myflorida/gover nment/ go vernorinit iatives/aplusplan/ opportunityScholar ships.html (Aug. 17, 2005). Therefore, the omission of the phrase "uniform public school system" in the legislative findings in the statute authorizing the OSP provides no justification for the majority's conclusion that the OSP violates article IX.
*425 Just as there is no textual or historical support for the majority's finding that article IX, section 1 mandates that the Legislature must make adequate provision for the education of Florida's children exclusively through the public school system, there is absolutely no support for the alternative finding that the OSP somehow prevents the Legislature from fulfilling its article IX mandate.

Conclusion
Our position as justices vests us with the right and the responsibility to declare a legislative enactment invalidbut only when such a declaration is an "imperative and unavoidable necessity." State ex rel. Crim, 159 So. at 664. No such necessity is evident in this case. Nothing in the plain language or history of article IX requires a finding that the Opportunity Scholarship Program is unconstitutional. The clear purpose behind article IX is to ensure that every child in Florida has the opportunity to receive a high-quality education and to ensure access to such an education by requiring the Legislature to make adequate provision for a uniform system of free public schools. There is absolutely no evidence before this Court that this mandate is not being fulfilled. Therefore, I agree with Judge Kahn and his two colleagues in the First District Court of Appeal's first opinion regarding this dispute over the OSP. "Nothing in article IX, section 1 clearly prohibits the Legislature from allowing the well-delineated use of public funds for private school education, particularly in circumstances where the Legislature finds such use is necessary." Bush, 767 So.2d at 675. The Opportunity Scholarship Program does not violate article IX, section 1 of Florida's Constitution.
CANTERO, J., concurs.
NOTES
[1] The plaintiffs also dismissed their separate claim under article IX, section 6 of the Florida Constitution, which provides:

State school fund.The income derived from the state school fund shall, and the principal of the fund may, be appropriated, but only to the support and maintenance of free public schools.
[2] Article I, section 3 provides:

Religious freedom.There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.
[3] When the OSP was enacted in 1999, the Legislature's findings and intent contained slightly different language. Specifically, the Legislature stated that it found "that the State Constitution requires the state to provide the opportunity to obtain a high-quality education." See § 229.0537(1), Fla. Stat. (1999).
[4] Section 1008.22, Florida Statutes (2005), is titled "Student assessment program for public schools," and requires the Commissioner of Education to, among other things, develop and implement the Florida Comprehensive Assessment Test ("FCAT"). See § 1008.22(3)(c), Fla. Stat. (2005).
[5] This first constitution was drafted during the 1838 Constitutional Convention but was not adopted until 1845, when Florida was admitted to the Union.
[6] Article X of the 1838 Constitution provided in full:

Section 1. The proceeds of all lands that have been or may hereafter be granted by the United States for the use of Schools, and a Seminary or Seminaries of learning, shall be and remain a perpetual fund, the interest of which, together with all moneys derived from any other source applicable to the same object, shall be inviolably appropriated to the use of Schools and Seminaries of learning respectively, and to no other purpose.
Section 2. The General Assembly shall take such measures as may be necessary to preserve from waste or damage all land so granted and appropriated to the purposes of Education.
[7] This first public system of schools was open only to white children between the ages of five and eighteen. See ch. 229, art. I, § 3, Laws of Fla. (1848-49).
[8] Although not confirmed by the written record of the 1885 constitution, some commentators have suggested that the removal of the "paramount duty" provision along with the addition of a section explicitly requiring racial segregation (article XII, section 12, Florida Constitution (1885)) may indicate that the "drafters of the 1885 Constitution wished to prevent both mixed-race schooling and any real `equality' requirement for the supposedly `separate but equal' schools established for African-American children." Jon Mills & Timothy Mclendon, Setting a New Standard for Public Education: Revision 6 Increases the Duty of the State to Make "Adequate Provision" for Florida Schools, 52 Fla. L.Rev. 329, 349 n. 98 (2000).
[9] Article IX, section 1 was renumbered as section 1(a) and modified to include the class size amendment.
[10] In Davis v. Grover, 166 Wis.2d 501, 480 N.W.2d 460 (1992), which is cited by the dissent, the Wisconsin Supreme Court in a four-to-three decision upheld a program providing public funds to children from low-income families to attend nonsectarian schools against several constitutional challenges, including one resting on language similar to the third sentence in article IX, section 1(a) of the Florida Constitution. See id. at 473-74. However, the education article of the Wisconsin Constitution construed in Davis, see Wis. Const., art. X, does not contain language analogous to the statement in article IX, section 1(a) that it is "a paramount duty of the state to make adequate provision for the education of all children residing within its borders."
[11] See Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (holding that a law that prohibited parents from choosing private education over public schooling for their children "unreasonably interfere[d] with the liberty of parents ... to direct the upbringing and education of [their] children"); Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996) ("[T]he State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm.").
[12] Further, as the dissent acknowledges, students become eligible for opportunity scholarships only if a public school has repeatedly failed to meet the Legislature's standards for a "high quality education." Dissenting op. at ___ n. 11. Similarly, Judge Benton noted below that the only circumstances in which opportunity scholarships are available "are antithetical to and forbidden by" the constitutional requirement that the state provide a "high quality system of free public schools." Bush, 886 So.2d at 370-71 (Benton, J., concurring).
[13] In 1998, the term "physical handicap" was changed to "physical disability."
[14] The dissent notes that Florida funded private schools until the early Twentieth Century, which is of merely historical interest because the practice ended long before the adoption of the 1998 constitutional amendment we construe and apply today. The dissent cites no authority suggesting that the constitutional validity of these allocations was ever challenged as an unconstitutional public funding of private schools under Florida's education article.
[15] The majority repeatedly suggests that the scope of this program is irrelevant to the question of constitutionality. See majority op. at 398 & 409. If the text of article IX contained the exclusivity that the majority reads into this provision, I would agree. However, the text of article IX does not support exclusivity. Therefore, the only remaining basis for finding the OSP unconstitutional is to assert that the OSP prevents the State from fulfilling its mandate to make adequate provision, "by law for a uniform, efficient, safe, secure, and high quality system of public schools." The scale of the program would be relevant to this analysis because it is possible that a more widespread program would prevent the Legislature from fulfilling its mandate. As I will explain in more detail later, there is no evidence that the OSP prevents the Legislature from fulfilling this mandate; therefore, there is no support for the majority's claim that the OSP violates article IX, section 1.
[16] The other two mandates in article IX, section 1 were added in 2002. The first requires the State to make adequate provision for reasonable class size, and the second requires the State to make adequate provision for a high quality pre-kindergarten program. See art. IX, § 1(a)-(b).
[17] In addition to Mississippi and South Carolina, Alaska, California, Hawaii, Kansas, Michigan, Nebraska, New Mexico, and Wyoming also prohibit public education funds from going to any private school in their state constitutions. See Alaska Const. art. VII, § 1; Cal. Const. art. IX, § 8; Haw. Const. art. 10, § 1; Kan. Const. art. 6, § 6(c); Mich. Const. art. VII, § 2; Neb. Const. art VII, § 11; N.M. Const. art. VII, § 2; Wyo. Const. art. VII, § 4.
[18] This argument is buttressed by the fact that the people of Florida explicitly revised the language of article IX, section 1 twice after the OSP program was enacted in order to add two additional mandates. Yet, none of these amendments inserted a prohibition against allocating public funds to private schools. See art. IX, § 1(a), Fla. Const.; Advisory Op. to the Att'y Gen. re Florida's Amendment to Reduce Class Size, 816 So.2d 580, 586 (Fla. 2002) (approving a proposed amendment to mandate maximum class sizes for placement on the ballot); see also art. IX, § 1(b)-(c) Fla. Const.; Advisory Op. to the Att'y Gen. re Voluntary Universal Pre-kindergarten Educ., 824 So.2d 161, 167 (Fla.2002) (approving a proposed amendment to require the Legislature to provide a "high quality pre-kindergarten learning opportunity" for placement on the ballot).
[19] Courts should not use legislative history to depart from the text's plain meaning. It is dangerous to attempt to divine the intent behind a statutory or constitutional provision from the statements of individuals involved in the process. See Am. Home Assur. Co. v. Plaza Materials Corp., 908 So.2d 360, 371 (Fla.2005) (Cantero, J., concurring in part and dissenting in part). Nonetheless, a majority of this Court apparently finds legislative history persuasive, at least when interpreting statutory text. Id. at 368-69. Therefore, I include the history of article IX here not because I would rely on it in upholding the OSP program, but because it demonstrates that there is no refuge for the majority's finding the OSP is unconstitutional.
[20] The provision at issue in Davis was article X, section 3 of the Wisconsin Constitution. The provision stated:

The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years.
[21] This statement was made as an introduction to Proposal 181, which suggested this language for article IX:

SECTION 1: System of Public education.  Each resident of this state has a fundamental right to a public education during the primary and secondary years of study, and it is the paramount duty of the state to ensure that such education is complete and adequate. Ample Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
This proposal was to be read in conjunction with a proposal defining "adequate provision," which had already been passed. Fla. Constitutional Revision Commission, Meeting Proceedings for January 15, 1998, transcript at 263, http://www.law.fsu.edu/crc/minutes.html (statement of Commissioner Brochin).
[22] Article IX, section 6, became a part of Florida's Constitution in 1838. It was incorporated in response to a federal initiative in which Congress set aside one section of every township in the Northwest Territories for "the maintenance of the `common schools.'" Wade R. Budge, Comment, Changing the Focus: Managing State Trust Lands in the Twenty-First Century, 19 J. Land Resources & Envtl. L. 223, 225 (1999). Documents surrounding this initiative suggest that Congress' primary concern was to further education. In legislation enacted two years after the 1785 allocation, Congress stated that the 1785 land grants were given in recognition of the fact that "religion, morality and knowledge [were] necessary for good government and the happiness of mankind.... [Therefore,] schools, and the means of education shall forever be encouraged." Id. It was not until 1837 that the requirement that this land be dedicated to education alone was incorporated into a state constitution. In 1837, Michigan became the first state to incorporate this requirement in its constitution, and almost every state that joined the union afterwards followed suit. Id. at 227. Florida received its land grant on March 3, 1845. An act supplemental to that admitting Florida into the union provided the sixteenth section "in every township or other land equivalent thereto" for the support of public schools. James B. Whitfield, Legal Background to the Government of Florida in The Florida Bar, Florida Real Property Title Examination and Insurance apx. 20 (4th ed.1996). This act also set aside two townships for the creation of seminaries and required that five percent of the net proceeds of a future sale of federal land be applied "for the purposes of education." Id.
[23] The majority disputes this assertion by claiming that the constitutionality of these provisions has never been challenged. I disagree. In Scavella v. Sch. Bd. of Dade County, this Court upheld a statute that allowed public funds to be used for private education. 363 So.2d 1095 (Fla.1978). I recognize that the majority distinguishes the OSP from the statute at issue in Scavella; however, I find its reasons for doing so unpersuasive. First, the majority argues that Scavella is not applicable here because this Court addressed a different issue. I disagree. In Scavella, this Court defined its duty as deciding whether the statute at issue denied the appellant any right. 363 So.2d at 1097-98, citing art. I, § 2, Fla. Const. (stating that "[N]o person shall be deprived of any right because of race, religion or Physical handicap."). Then, it held that article IX, section 1's mandate that the Legislature "provide for a `uniform system of free public schools'" guaranteed that "all Florida residents have the right to attend this public school system for free." Id. at 1098. This Court found that the Legislature's determination that the public school system was not meeting the student's educational needs authorized the Legislature to require school districts to pay private schools an amount that would not deprive any student of a free education. Id. at 1099.

Second, the majority's distinction between "special" and "routine" education services is unconvincing. That is more of a policy distinction than a legal one. Indeed, article IX does not draw any such distinction. It declares that the State has a "paramount duty... to make adequate provision for the education of all children residing within [Florida's] borders." Art. IX, § 1, Fla. Const. (2004). Presumably, "all children" includes exceptional students. While article IX was revised after Scavella was decided, the 1998 revisions simply emphasized the importance of the Legislature's obligation to make adequate provision for education. In addition, such a distinction would place this Court in the difficult position of determining whether or not an educational service is the type regularly provided in the public school. For example, can the Legislature provide a scholarship to a dyslexic student whose public school does not offer help with reading? Can the Legislature provide an opportunity scholarship to a student whose public school offers no advanced placement courses? If these services are routinely provided in another public school, perhaps one located in a wealthier district, but not in the student's public school, does that make the service "routine" and prohibit the Legislature from providing it through a nonpublic school? The majority's distinction will quickly place the judicial system in an untenable role.
This distinction also ignores the fact that students only become eligible for opportunity scholarships if their public school has repeatedly failed to meet the Legislature's standards for a "high quality education." It is nonsensical to hold that article IX allows the Legislature to fund education outside the public school system when the public school system fails to uphold its constitutional duty in regard to disabled students but prohibits it when that school system fails to uphold the duty in regard to disadvantaged students. The majority's distinction between "special" and "routine" in determining when the Legislature can provide education through a nonpublic school is untenable. As I said before, this is more of a policy distinction than a legal one, and absent an express or necessarily implied mandate to the contrary, our constitutional form of government leaves such policy distinctions to the legislative branch.
[24] Records indicate that the State allocated $7500 to private schools in 1887, $1000 in 1892-98, $600 in 1900, and $800 in 1904. Gabel, supra, at 639 n. 63. While this funding rarely went to academies providing education to white students, Florida relied heavily on private sources, such as the Freedman's Bureau and a number of church academies, to educate African-American children. Id.
[25] Amendment 686 proposed that a new section be added to article IX with this language:

Section . . . . No law shall be enacted authorizing the diversion or lending of any public school funds or the use of any part of them for support of any sectarian school.
It was adopted as an amendment to Amendment 682, but was not included in the proposed constitution that the Committees on Style and Drafting presented to the House of Representatives on December 13, 1967. See 3 Minutes: Committee of the Whole House, Constitutional Revision 55 (1967).