PER CURIAM.
*128 This case involves a nearly ten-year attempt by Petitioners to have the State of Florida's K-12 public education system declared unconstitutional due to the State's alleged failure to comply with article IX, section 1(a) of the Florida Constitution, which provides in relevant part as follows:
*129 (a) The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education ....
Art. IX, § 1(a), Fla. Const. Specifically, Petitioners seek a declaration that the State is breaching its "paramount duty to make adequate provision for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education." And Petitioners request the courts to order the State "to establish a remedial plan that ... includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."
The language in article IX, section 1(a) regarding "fundamental value," "paramount duty of the state," and "efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education" was added in 1998, after the changes were proposed by the Constitution Revision Commission (CRC) and approved by the voters. Prior to 1998, article IX, section 1 provided in relevant part as follows:
Adequate provision shall be made by law for a uniform system of free public schools ....
The 1998 amendments were in part in response to Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles (Coalition ), 680 So.2d 400 (Fla. 1996), in which this Court upheld the trial court's dismissal with prejudice of a complaint that "asked the trial court to declare that an adequate education is a fundamental right ... and that the State has failed to provide its students that fundamental right by failing to allocate adequate resources for a uniform system of free public schools." Id. at 402. The allegations in Coalition -made in the context of "a blanket assertion that the entire system is constitutionally inadequate," id. at 406 -focused on purported inadequacies in funding and disparities relating to certain subgroups of students, including "[e]conomically deprived students," disabled students, and "[s]tudents in property-poor counties." Id. at 402. This Court upheld the dismissal with prejudice because the appellants made "an insufficient showing" "to justify" "judicial intrusion" into the Legislature's powers and responsibilities. Id. at 407 ; see id. at 408 (Overton, J., concurring).
Here, Petitioners' blanket challenge bears a striking resemblance to that in Coalition , namely in its focus on purportedly inadequate funding and on disparities relating to certain subgroups of students. The trial court, relying on Coalition and dismissing the relevance of the 1998 amendments, rejected Petitioners' challenge. The First District Court of Appeal affirmed.
We have for review Citizens for Strong Schools, Inc. v. Florida State Board of Education (Citizens ), 232 So.3d 1163 (Fla. 1st DCA 2017), in which the First District concluded that the 1998 amendments-namely, the words "efficient" and "high quality"-do not provide sufficiently manageable standards to overcome the political question and separation of powers concerns that were determinative in Coalition . We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
We conclude that Coalition defeats Petitioners' claim because Petitioners-like the appellants in Coalition -fail to present any manageable standard by which to *130 avoid judicial intrusion into the powers of the other branches of government. Accordingly, we approve the result reached by the First District. Before explaining our decision, we review the lengthy procedural history of this case.
I. BACKGROUND
This case began in November 2009-in the wake of the Great Recession-when certain public school students, parents, and citizen organizations (collectively, Petitioners) filed suit against the State Board of Education, the President of the Florida Senate, the Speaker of the Florida House of Representatives, and the Florida Commissioner of Education (collectively, Respondents) seeking a declaration that the State is breaching its paramount duty under article IX, section 1(a). Or as the First District later described it, Petitioners' claim is "that the State's entire K-12 public education system-which includes 67 school districts, approximately 2.7 million students, 170,000 teachers, 150,000 staff members, and 4,000 schools-is in violation of the Florida Constitution." Citizens , 232 So.3d at 1165.
In their complaint, Petitioners cited the 1998 amendments to article IX, section 1 and asserted that "adequate provision" and "high quality" are to be "measured by both the enumerated characteristics of and inputs into the system itself as well as the outcome results of that system." Petitioners largely focused on purported inadequacies in funding and alleged that the "2009 Appropriations Act for K-12 education violates the Education Clause of the Florida Constitution." Petitioners also criticized, among other things, the State's "current accountability policy," "misus[e]" of standardized test results, inadequate graduation rates, and achievement test results. Petitioners further alleged that the State's alleged "failure to provide a high quality education disproportionately impacts minority, low income and students with disabilities." In the end, Petitioners requested that the trial court order Respondents "to establish a remedial plan that conforms with the Florida Constitution." Petitioners later amended their complaint to request that the remedial plan "include[ ] necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."
Respondents' Motion to Dismiss
Respondents moved to dismiss Petitioners' complaint, principally on the basis that Petitioners' claim "alleges a non-justiciable political question" and was similar to the blanket challenge rejected in Coalition . The trial court denied Respondents' motion, distinguishing Coalition as "no longer binding authority" because the allegations there were less comprehensive and were "based on a prior and weaker version of the current Article IX, Section 1." The trial court instead relied on this Court's 2006 decision in Bush v. Holmes , 919 So.2d 392 (Fla. 2006), which interpreted the post-1998 article IX, section 1 in the context of a challenge to a voucher program. The trial court pointed to language in Holmes that noted that the 1998 amendments had been drafted "to provide standards by which to measure the adequacy of the public school education provided by the state." (Quoting Holmes , 919 So.2d at 403.) The trial court thus permitted Petitioners' claim "seek[ing] system-wide declaratory and supplemental relief" to proceed.
Respondents' Petition for a Writ of Prohibition
Respondents-continuing to rely on Coalition -next petitioned the First District for a writ of prohibition, asserting that the trial court lacked jurisdiction to adjudicate the political questions presented by the case.
*131 Haridopolos v. Citizens for Strong Sch., Inc. , 81 So.3d 465, 470 (Fla. 1st DCA 2011). The First District sitting en banc denied the petition but noted that Respondents' arguments regarding the political question doctrine would remain available on appeal. Id. at 471. The First District also certified the following as a question of great public importance:
DOES ARTICLE IX, SECTION 1(A), FLORIDA CONSTITUTION, SET FORTH JUDICIALLY ASCERTAINABLE STANDARDS THAT CAN BE USED TO DETERMINE THE ADEQUACY, EFFICIENCY, SAFETY, SECURITY, AND HIGH QUALITY OF PUBLIC EDUCATION ON A STATEWIDE BASIS, SO AS TO PERMIT A COURT TO DECIDE CLAIMS FOR DECLARATORY JUDGMENT (AND SUPPLEMENTAL RELIEF) ALLEGING NONCOMPLIANCE WITH ARTICLE IX, SECTION 1(A) OF THE FLORIDA CONSTITUTION ?
Id. at 473. Judge Roberts and six other judges dissented, arguing that the petition should be granted. Id. at 481 (Roberts, J., dissenting). Judge Roberts examined Coalition and concluded that the 1998 amendments were "ultimately irrelevant":
Whether the [Constitution Revision] Commission intended to create a justiciable standard is ultimately irrelevant. The test is whether an enforceable standard was actually created by the text of the amendment itself. Because the terms "efficient ... and high quality" are no more susceptible to judicial enforcement than the term "adequate," this claim cannot be enforced by the courts.
Id. at 478 (Roberts, J., dissenting).
This Court declined to exercise jurisdiction. Haridopolos v. Citizens for Strong Sch., Inc. , 103 So.3d 140 (Fla. 2012) (table).
Petitioners' Second Amended Complaint
In May 2014-nearly 4.5 years after their original complaint challenging the "2009 Appropriations Act"-Petitioners filed a Second Amended Complaint.[1] Petitioners again focused on funding, including alleged failures of the State both to provide an adequate "overall level of funding" and to "conduct[ ] a cost analysis in order to determine the amount of funding required to institute a high quality education system." Petitioners also alleged that the State had failed to provide "a 'uniform' system of free public schools," was instead "systematically diverting public funds to private schools," and had "created a parallel system of schools." To support their uniformity argument, Petitioners described two choice programs-the Florida Tax Credit Scholarship Program (FTC) and the McKay Scholarship for Students with Disabilities Program (McKay). Petitioners also alleged for the first time that the State had failed to provide an "efficient system of free public schools," claiming that the State's various reforms and programs had "wasted millions of dollars without producing the desired effect of a high quality public school system." Petitioners reiterated their allegation that the State had failed to produce a "high quality" system, and they again requested an order directing Respondents "to establish a remedial plan that ... includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."
FTC/McKay Intervenors
In the wake of Petitioners' factual allegations regarding the FTC and McKay *132 programs, the trial court permitted certain parents whose children were beneficiaries of those programs to intervene (Intervenors). Petitioners later filed a Motion for Partial Summary Judgment seeking a declaratory judgment that the FTC and McKay programs violate the uniformity requirement of article IX, section 1(a). The Intervenors opposed and submitted their own Motion for Partial Judgment on the Pleadings.
The trial court eventually ruled that the Second Amended Complaint did not contain any "claim that either program violates the Florida Constitution" and did not include any request for declaratory relief with respect to either program. The trial court also ruled that Petitioners lacked standing to challenge the FTC program. The trial court nevertheless permitted Petitioners-consistent with the pleadings-to present evidence "regarding the impact of each program on the uniformity and funding of the overall public education system."
The Trial Court's Final Judgment
After years of substantial discovery, the case proceeded to trial in 2016. After a nearly four-week bench trial involving dozens of witnesses and more than 5,000 exhibits, the trial court-a different trial judge than the one who originally denied Respondents' motion to dismiss-entered Final Judgment against Petitioners "on all claims." The trial court did so after making extensive and detailed findings. Indeed, the Final Judgment includes a 175-page appendix of findings of fact.
The trial court early on noted that "Florida's system of education is structurally complicated," in part because each county has its own school board with constitutional duties and authority. The trial court thus explained that variability necessarily exists between school districts, even among those with equivalent funding, given "variations in how the local districts allocate their resources." And the trial court concluded that the school districts, who were not parties to the suit, were "indispensable parties" to the extent Petitioners "seek relief for decisions that Florida law entrusts to local school districts-including decisions on hiring, staffing, and the allocation of resources among schools within a particular district."
The trial court went on to address the issue of justiciability anew, concluding that Petitioners presented a nonjusticiable "blanket" challenge to the adequacy of the entire education system and that, despite the 1998 amendments, the "new adjectives ... -'efficient and high quality'-do not give judicially manageable content to the adequacy standard that was held non-justiciable in the Coalition case." In other words, the issues remained "political questions best resolved in the political arena." The trial court noted for example that "many of Florida's education policies and programs are subject to ongoing debate without any definitive consensus." The trial court also held that Petitioners' claim fails because of "Florida's strict separation-of-powers doctrine."
Nevertheless, given the lack of a final appellate ruling on the justiciability issue, the trial court-at great length-addressed the evidence. After determining that the burden was on Petitioners to show that Respondents' actions "are irrational or unconstitutional beyond a reasonable doubt," the trial court repeatedly discussed the "weight of the evidence" and what the evidence showed for each of Petitioners' major subdivisions of allegations. For example, the trial court concluded:
The weight of the evidence shows that the State has made education a top priority both in terms of implementation of research-based education policies and reforms, as well as education funding.
*133 The State has an accountability and assessment system that is rated among the best in the nation, resulting in more "A" graded schools over time. The State has also adopted rigorous teacher certification, training and evaluation standards, resulting in over 94% of courses being taught by teachers who are "highly qualified" under federal standards.
Regarding funding, the trial court found, "based on the evidence presented, that there is not a constitutional level lack of resources available in Florida schools." More specifically, the trial court observed:
With respect to funding, the evidence indicates that over the past twenty years, K-12 education has been the single largest component of the state general revenue budget. Even during the recent, severe economic downturn, the State ensured that education funding was less impacted than other government services and functions. In the current school year, the State funds education at the highest level in Florida history. Since the 1997-98 school year, education funding has outpaced inflation. The State has made efforts to equalize its funding and considers education costs for different student programs and cost-of-living differences across the state. It also is significant that the State has provided sufficient funding for schools to meet the class size requirements set forth in Article IX.[2]
The trial court also found that the State's "complex funding formula"-the Florida Education Finance Program-"is generally recognized as one of the most equalizing school funding formulas in the nation." The trial court also determined that "all of the school districts in Florida have excess capacity for generating revenue through local property taxes or sales surtaxes" and that "many" of the district witnesses cited "political" reasons for not doing so.
The trial court also addressed Petitioners' arguments regarding graduation rates, test results, and disparities among certain subgroups. After determining that the "most appropriate" examination of student performance is one that views that performance "over time and in context," the trial court described substantial, dramatic, and sustained improvements that have taken place in Florida since the late 1990's, including that "the high school graduation rate has increased by over 25 points, with more students of all racial, ethnic, and socioeconomic backgrounds graduating than ever before." The trial court also cited "dramatic" and sustained improvement on test results as measured by "a variety of measures, including national and international assessments." Regarding achievement and performance gaps, the trial court found that these gaps unfortunately "exist throughout the country," but that "Florida's gaps are smaller than the national gaps, and Florida has outpaced the nation in closing these gaps ." (Emphasis added.) As one example, the trial court found that "Florida's students eligible for free-and-reduced-price lunch ranked first in the nation, outperforming similar economically disadvantaged students in all other states." As another example, the trial court found that during the relevant period, Florida was "the only state in the nation to narrow the achievement gap between White and Black/African-American students in both reading and mathematics in the fourth and eighth grades." And as it relates to Petitioners' theory of the case-that is, the "need for more resources" argument-the trial court specifically *134 found that Petitioners "failed to establish any causal relationship between any alleged low student performance and a lack of resources." (Emphasis added.) In the end, the trial court described an education system that is not perfect but that is working very well overall and has been "a top priority" of the State.
Finally, regarding the FTC and McKay programs, the trial court reiterated its prior rulings and found "no negative effect on the uniformity or efficiency of the State system of public schools due to these choice programs."
The First District's Decision
On appeal, the First District affirmed in all respects. Citizens , 232 So.3d at 1174. The First District agreed with the trial court that Petitioners' arguments "raise political questions not subject to judicial review, because the relevant constitutional text does not contain judicially discoverable standards by which a court can decide whether the State has complied with organic law." Id. at 1165. The First District also agreed that Florida's "strict separation of powers ... requires judicial deference to the legislative and executive branches to adopt and execute educational policies those branches deem necessary and appropriate to enable students to obtain a 'high quality' education." Id. at 1165-66. According to the First District, article IX, section 1(a) does not "empower judges to order the enactment of educational policies regarding teaching methods and accountability, the appropriate funding of public schools, the proper allowance of charter schools and school choice, the best methods of student accountability and school accountability, and related funding priorities." Id. at 1166.
The First District began by examining Coalition and its reference to the Supreme Court's analysis of the political question doctrine in Baker v. Carr , 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Citizens , 232 So.3d at 1168. The First District explained how the instant case fell within Baker 's "dominant considerations " of "attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination.' " Id. (quoting Baker , 369 U.S. at 210, 82 S.Ct. 691 ). Indeed, the First District noted that this case "consume[d] years in the court system ... over the meaning of subjective and undefined phrases that might function to give guidance to political decision makers as laudable goals, but cannot guide judges in deciding whether a state or local government has in fact complied with the text." Id. at 1169.
The First District then explained how Coalition rejected a similar "blanket challenge to the adequacy of the education system." Id. at 1169-70. The First District noted that the plaintiffs in Coalition "failed to demonstrate any manageable standards that could be applied without 'a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature.' " Id. at 1170 (quoting Coalition , 680 So.2d at 408 ). The First District agreed with the trial court that " 'efficient' and 'high quality' are no more susceptible to judicial interpretation than 'adequate' was under the prior version of the education provision." Id.
The First District concluded that its holding was supported "by Florida's strict separation of powers doctrine and by the language of the amended constitutional article itself." Id. On the latter point, the First District noted that the 1998 amendments retained the language that "adequate provision shall be made by law ," id. at 1171 (quoting art. IX, § 1(a), Fla. Const.), leading the First District to conclude "that the constitution continues to *135 commit education policy determinations to the legislative and executive branches," id.
The First District "recognize[d] that courts in other states have sometimes purported to define" similar concepts in their education articles, but the First District concluded that those decisions were "insufficiently deferential to the fundamental principle of separation of powers ... and the practical reality that educational policies and goals must evolve to meet ever changing public conditions." Id. at 1172. The First District instead agreed with other courts that have declined to impose upon the legislature the court's view of "adequacy, efficiency, and quality." Id.[3]
Lastly, the First District affirmed the trial court's rejection of Petitioners' arguments regarding uniformity and the FTC and McKay programs. Id. at 1173-74.
II. ANALYSIS
This Court is being asked to determine whether in this case we have been presented with a manageable standard for assessing-in the context of a blanket challenge to the constitutionality of the K-12 education system-whether the State has made "adequate provision" for an "efficient" and "high quality" system of education "that allows students to obtain a high quality education" under article IX, section 1(a) of the Florida Constitution. The trial court and the First District both held in the negative, relying on the reasoning in Coalition . This question presents a pure issue of law that is subject to de novo review. W. Fla. Reg'l Med. Ctr., Inc. v. See , 79 So.3d 1, 8 (Fla. 2012) ("Statutory and constitutional construction are questions of law subject to a de novo review."). We decline to address the other issues raised by Petitioners.[4]
We agree with the lower courts that Petitioners' blanket challenge does not survive the reasoning in Coalition , notwithstanding the 1998 amendments to article IX, section 1(a). Although we do not necessarily agree with what appears to be the district court's conclusion that an article IX challenge could never be justiciable, see Coalition , 680 So.2d at 408 (declining to say "never"), we need not decide that issue. Instead, this case turns in part on Petitioners' failure to present the courts with any roadmap by which to avoid intruding into the powers of the other branches of government.
At the outset, we strongly reject any suggestion in the dissenting opinions that those of us agreeing to approve the result reached by the First District are shirking a constitutional duty or somehow care less than the dissenting justices about the education of Florida's children. Indeed, the refusal to recognize both the blanket nature of Petitioners' challenge and that this case amounts to a request for the courts to determine the appropriate amount of education funding explains in large part the asserted struggle to understand the "judicial *136 universe" in which this case is being decided. Dissenting op. at 146, 156 (Pariente, J.).[5]
This suit began nearly a decade ago in what largely resembled a funding challenge to the "2009 Appropriations Act." Since then, not only has that appropriations act come and gone, but so too have many subsequent appropriations acts. Moreover, in that same time span, the Legislature has revised-on more than one occasion-the standards and assessments complained of by Petitioners. And the trial court explained how the State's process for developing, administering, scoring, and reporting is "an inclusive process involving Florida educators all along the way." The point being, the education system-and education policy itself-does not remain static and is instead continually being shaped by various interested parties. Thus, Petitioners' challenge is fundamentally different than a challenge to a specific program or a specific funding issue. In effect, Petitioners ask this Court to declare the current educational system unconstitutional based on years-old evidence.
In any event, to explain why we approve the result reached by the First District, we begin by reviewing this Court's 1996 decision in Coalition . We then examine certain subsequent amendments to and failed attempts to amend article IX, section 1, including the adopted 1998 amendments at issue. We then examine this Court's more recent decision in Holmes . We conclude by explaining why Petitioners fail to overcome Coalition . As this Court did in Coalition , we decline to look to other jurisdictions. Coalition , 680 So.2d at 404-05. Instead, we look to the language of the Florida Constitution and this Court's decisions.
Coalition
In Coalition , this Court addressed a similar challenge to the "adequacy" of the entire school system, but one brought under the pre-1998 article IX, section 1. Coalition , 680 So.2d 400. The appellants in Coalition sought a declaration "that an adequate education is a fundamental right under the Florida Constitution, and that the State has failed to provide its students that fundamental right by failing to allocate adequate resources for a uniform system of free public schools." Id. at 402. Among other things, the allegations focused on purported inadequacies relating to certain subgroups of students. Id. The trial court dismissed the complaint with prejudice, and this Court affirmed. Id.
Coalition began by exploring the history of Florida's education article, noting among other things that the Constitution was amended in 1868 to provide that it was "the paramount duty of the State to make ample provision for the education of all the children," and that the "paramount duty" language was subsequently deleted in 1885. Id. at 405.[6] Coalition then examined *137 the language of the present education article, noting that "adequate provision" had not been defined but that this Court had on numerous occasions "attempted to define" the phrase "uniform system of free public education." Id. at 406. In doing so, this Court noted that those prior cases all involved "an objection to some specific funding issue," as opposed to "a blanket assertion" against the adequacy of "the entire [education] system." Id. Recognizing the nature of the case as a challenge to the Legislature's overall funding of education, this Court ultimately agreed with the trial court that "the courts cannot decide whether the Legislature's appropriation of funds is adequate in the abstract, divorced from the required uniformity" because doing so "would necessarily" require the courts "to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them." Id. at 406-07 (quoting trial court's order). This Court further agreed that "if the Court were to declare present funding levels 'inadequate,' presumably the Plaintiffs would expect the Court to evaluate, and either affirm or set aside, future appropriations decisions." Id. at 407 (quoting trial court's order).
Coalition then more directly addressed the separation of powers doctrine, explaining that the appellants' funding challenge implicated constitutional provisions other than just article IX. Indeed, after noting that the separation of powers doctrine was "expressly set[ ] forth" in article II, section 3 and that article VII, section 1(c) "expressly reserve[s] to the legislative branch" the power to appropriate funds, this Court concluded that "an insufficient showing has been made to justify judicial intrusion" into the Legislature's appropriations power. Id. at 407-08. This Court further concluded that, unlike the term "uniform," the term " 'adequacy' simply does not have such straightforward content." Id. at 408. This Court thus agreed with the appellees' reliance on Baker , in which the Supreme Court "set forth six criteria to gauge whether a case involves a political question," including "(1) a textually demonstrable commitment of the issue to a coordinate political department; [and] (2) a lack of judicially discoverable and manageable standards for resolving it." Id. Coalition summed up:
While we stop short of saying "never," appellants have failed to demonstrate in their allegations, or in their arguments on appeal, an appropriate standard for determining "adequacy" that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing by law for an adequate and uniform system of education).
Id. In doing so, this Court stated "that the legislature has been vested with enormous discretion by the Florida Constitution to determine what provision to make for an adequate and uniform system of free public schools." Id. (emphasis added).
In a concurring opinion, Justice Overton agreed with the majority that an insufficient showing had been made to justify judicial intrusion but wrote separately to express his view that the majority's holding does not preclude the judiciary from being involved in the enforcement of article IX, section 1. Id. at 408 (Overton, J., concurring). Justice Overton opined that although the education article "does not *138 ensure a perfect system" or "guarantee[ ] a perfect or ideal education," it also "does not preclude the treatment of education as an essential, fundamental right." Id. at 409 (Overton, J., concurring). And Justice Overton suggested that the term "adequate" must have some "minimum threshold ... below which the funding provided by the legislature would be considered 'inadequate.' " Id. As an example, Justice Overton suggested that an allegation of "a thirty percent illiteracy rate" in a county would "at least state[ ] a cause of action." Id.[7]
In a dissenting-in-part opinion joined by two other justices, Justice Anstead argued that, given the "comprehensive allegations of inadequacies set out in appellants' complaint," the appellants should have been permitted to establish a factual context and that this Court had "failed to carry out its duty to ensure that the legislature has performed its constitutional mandate." Id. at 410 (Anstead, J., dissenting in part). Justice Anstead also emphasized the importance of education, positing that "[s]urely all would agree that education is a fundamental value in our society." Id. In Justice Anstead's view, the education article "recognized the fundamental value of education," and there was no need "to add 'puffing' words to suggest the quality of the system contemplated." Id. at 410-11 (Anstead, J., dissenting in part).
Failed 1997 Amendment to Article IX
One year after Coalition , this Court addressed an initiative petition that sought to amend article IX, section 1 by defining "[a]dequate provision for funding public education" to mean a minimum percentage (40%) of total appropriations. Advisory Op. to the Att'y Gen. re Requirement for Adequate Pub. Educ. Funding , 703 So.2d 446, 447 (Fla. 1997). This Court struck the proposed amendment as violative of the single subject requirement of article XI, section 3. Id. at 448. This Court found that the amendment "arbitrarily" and "substantially affects ... other functions" of government in Florida, including "various vital functions." Id. at 449. This Court also noted the proposed amendment's impact on the "functions of executive approval and veto" set forth in article III, section 8. Id.
The 1998 Amendments to Article IX
In 1998, the CRC proposed and the voters approved the changes to article IX, section 1 at issue here. The 1998 amendments did not adopt Justice Overton's view in Coalition and declare education to be a "fundamental right." Coalition , 680 So.2d at 409 (Overton, J., concurring). Instead, the amendments stated that education of children is "a fundamental value of the people," tracking some of the language in Justice Anstead's dissenting-in-part opinion in Coalition . See id. at 410 (Anstead, J., dissenting in part). The 1998 amendments also returned the "paramount duty" language to the education article, although the amendments-presumably in recognition of the Legislature's need to fund "the various vital functions of State government, including not only education," Advisory Op. to the Att'y Gen. re Requirement for Adequate Pub. Educ. Funding , 703 So.2d at 449 -described the State's duty to make adequate provision as "a paramount duty," whereas the 1868 Constitution described the duty as "the paramount duty." Finally, the 1998 amendments added words such as "efficient" and "high quality" to describe the contemplated system of free public schools.
*139 Members of the 1998 CRC submitted competing amicus briefs in this case. On the one hand, some of the members assert that one of the goals of the 1998 amendments was "to provide a judicially-enforceable right to a public school system that is 'uniform, efficient, safe, secure, and high quality.' " On the other hand, other members argue that "common sense" indicates that "the ambiguous terms 'high quality' and 'efficient' " were used to "set forth aspirational goals" and "to avoid litigation of the type brought in this case."
2002 Amendment to Article IX-Class Size Reduction
In 2002-before any judicial interpretation of the term "high quality"- article IX, section 1(a) was amended by initiative petition. The 2002 amendment set a maximum number of students per classroom for various grade levels. See Advisory Op. to the Att'y Gen. re Florida's Amend. to Reduce Class Size , 816 So.2d 580, 581-82 (Fla. 2002). The 2002 amendment also established a phase-in period and expressly provided that the costs associated with meeting the class size reductions were to be borne by "the legislature"-i.e., "the state"-as opposed to the "local school districts." Id. at 581. The 2002 amendment also directly referenced the term "high quality" added to article IX, section 1 (a) in 1998:
To assure that children attending public schools obtain a high quality education, the legislature shall make adequate provision to ensure that ... there are a sufficient number of classrooms ....
(Emphasis added.) This Court upheld the validity of the initiative petition. Id. at 585-86.
Here, there is no suggestion that the Legislature failed to "make adequate provision" for the reduction of classroom sizes. On the contrary, the trial court found it "significant that the State has provided sufficient funding for schools to meet the class size requirements set forth in Article IX." In arguing to this Court that "high quality" is a judicially manageable standard for measuring the State's compliance with article IX, Petitioners make no mention of the 2002 amendment and the fact that the citizens constitutionalized a specific statewide policy with funding mandate "[t]o assure that children attending public schools obtain a high quality education." See Holmes , 919 So.2d at 407 ("[W]hen the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive ...." (quoting Weinberger v. Bd. of Pub. Instruction , 93 Fla. 470, 112 So. 253, 256 (1927) ) ). And in effectively urging the adoption of Petitioners' argument, the dissent references "basic rules of statutory construction," dissenting op. at 154 (Pariente, J.), and yet-like Petitioners-ignores the language added to article IX in 2002. We are unaware of any principle of statutory construction that supports Petitioners' and the dissent's approach.
Holmes
In 2006, this Court in Holmes addressed article IX, section 1(a) but not in the context of a blanket challenge to the K-12 system. Rather, Holmes involved a challenge to a specific voucher program known as the Opportunity Scholarship Program (OSP), under which any student from a "fail[ing]" public school could either move to a different, non-failing public school or "receive funds from the public treasury, which would otherwise have gone to the student's school district, to pay the student's tuition at a private school." Holmes , 919 So.2d at 397. The "narrow question" in Holmes was whether that second option involving the use of public funds was prohibited by article IX, section 1(a). Id. at 397-98. Holmes answered in the affirmative, concluding that the OSP "diverts public *140 dollars into separate private systems parallel to and in competition with the free public schools that are the sole means set out in the Constitution for the state to provide for the education of Florida's children" and that the OSP "funds private schools that are not 'uniform' when compared with each other or the public system." Id. at 398.
As Coalition did previously, Holmes examined the history of Florida's education article. In doing so, Holmes noted that the 1998 amendments were made "in response in part to Coalition ... to make clear that education is a 'fundamental value' and 'a paramount duty of the state,' and to provide standards by which to measure the adequacy of the public school education provided by the state." Id. at 403. Holmes also cited certain commentary from individuals involved with the 1998 CRC explaining that the 1998 amendments represented "an attempt" to provide measurable standards. Id. at 404. Holmes later recognized the 1998 amendments as "imposing a maximum duty on the state to provide for public education that is uniform and of high quality." Id. And Holmes later described article IX, section 1(a) as "provid[ing] a comprehensive statement of the state's responsibilities regarding the education of its children." Id. at 408.
Although Holmes recognized the usual framework of the presumptive constitutionality of statutes, Holmes ultimately invalidated the OSP because it was "in direct conflict with the mandate in article IX, section 1(a)." Id. at 405. Holmes explained that article IX, section 1(a) contained not just a mandate to make adequate provision for the education of all children, but also a restriction that the mandate be fulfilled solely by means of a system of free public schools. Id. at 407. In other words, the constitutional provision "does not authorize additional equivalent alternatives." Id. at 408.
The Reasoning and Result in Coalition Defeat Petitioners' Challenge
In Coalition , this Court upheld a dismissal with prejudice of a blanket challenge to the "adequacy" of the entire K-12 system-a challenge that bears a close resemblance to the challenge here. 680 So.2d at 402. This Court rejected the challenge in part because the phrase "adequate provision" did not have "straightforward content." Id. at 408. In doing so, this Court explained that previous cases attempting to interpret the education article all involved some "specific" challenge. Id. at 406. This Court thus balked at the possibility of intruding into the powers of the other branches, including possibly being expected "to evaluate, and either affirm or set aside, future appropriations decisions." Id. at 407 (quoting trial court's order). However, this Court refused to say "never." Id. at 408. Rather, the case turned on the challengers' "fail[ure] to demonstrate ... an appropriate standard ... that would not present a substantial risk of judicial intrusion." Id.
In his concurring opinion, Justice Overton agreed with the majority "that an insufficient showing has been made by the appellants to justify a judicial intrusion under the circumstances of this case." Id. at 408 (Overton, J., concurring). He went on to add that, in his view, the holding of the Court "does not mean that the judiciary should not be involved in the enforcement of this constitutional provision." Id.
In sum, although recognizing the possibility that some future case might present a justiciable claim under article IX, section 1, a majority of the Court determined that the Coalition appellants had not presented such a claim. There is no basis for concluding that Petitioners here have been any *141 more successful in framing a claim that is justiciable.
The 1998 amendments to article IX, section 1 undoubtedly heightened the Legislature's mandate to "a paramount duty." But the fact that the Legislature's duty to make "adequate provision" was heightened does not in and of itself provide the courts with "an appropriate standard for determining 'adequacy.' " Coalition , 680 So.2d at 408. Rather, the primary issue here is whether the term "high quality" provides such a standard. Although Holmes spoke of the 1998 amendments as "provid[ing] standards by which to measure the adequacy of the public school education provided by the state," 919 So.2d at 403, that language has no relevance here. Holmes did not involve a blanket "adequacy" challenge and did not remotely address the issue of whether the entire K-12 system was "efficient" or of "high quality." Instead, Holmes addressed a "narrow question," id. at 397, involving a specific voucher program and turned on other language in article IX, primarily "system of free public schools." In other words, Holmes in no way answers the question presented.[8]
Looking to the language of article IX, section 1(a), we conclude that the term "high quality" in and of itself does not have "straightforward content," Coalition , 680 So.2d at 408, at least in the context of a blanket challenge to the adequacy of the entire K-12 system. Indeed, "high quality" can reasonably be viewed as "puffing." Id. at 411 (Anstead, J., dissenting in part). It is thus hardly surprising that article IX, section 1(a) was subsequently amended in 2002 to constitutionalize a specific statewide policy -a classroom-size policy-along with a funding directive to "assure that children attending public schools obtain a high quality education." Art IX, § 1(a), Fla. Const.; see Reduce Class Size , 816 So.2d 580.
Putting aside the class size amendment, Petitioners simply cannot overcome this Court's reasoning and the result in Coalition . As in Coalition , they have failed to present the courts with any manageable standard by which to avoid judicial intrusion into the powers of the Legislature. Moreover, we find that the standard actually proposed by Petitioners for measuring the Legislature's compliance with article IX, section 1(a) is foundationally flawed.
Petitioners' argument largely is that the constitutional test "for measuring whether the State is providing an opportunity for a high quality education" should be based solely on the assessment results that measure whether students have learned the core content standards established by the Legislature. In other words, Petitioners do not ask this Court to define "high quality." Rather, they assert that the Legislature itself has already defined "high quality" and how to measure it. They thus allege that the educational system is constitutionally inadequate because the "assessment results show low achievement and wide disparities," particularly "for children experiencing poverty or attending school in poorer school districts."
Petitioners essentially ask this Court to constitutionalize the Legislature's own standards, which in part serve as goals. We reject that argument. In effect, Petitioners' argument is that a "high quality" system is whatever the Legislature says it is, so long as some acceptable-yet unknown-percentage *142 of all subgroups of students achieve a satisfactory level of "3" on the assessment. Nothing in the language of article IX, section 1(a) supports Petitioners' argument. Nor does this Court's case law. Moreover, as amicus Foundation for Excellence in Education logically points out, "adopting State standards as constitutional minima would have the perverse effect of encouraging the weakening of curriculum standards in order to achieve higher passage rates and to satisfy court-imposed requirements." See Br. of Amicus Foundation for Excellence in Education in Support of Respondents, at 13-14 (explaining how this phenomenon occurred in the wake of the federal No Child Left Behind Act of 2001).[9]
Not only do Petitioners conflate constitutional requirements with legislative standards, they also ignore-as do the dissenters-that in the years since this suit was first filed, the Legislature has revised the complained-of standards and assessments on more than one occasion. Moreover, Petitioners' argument flies in the face of the trial court's detailed findings, none of which Petitioners challenge for lacking a basis in the record. As just a few examples, the trial court found that: "Florida has been a national leader in education reform"; Florida intentionally adopted rigorous standards and set cut scores at a level that places the majority of students below the satisfactory level; scoring a "Level 1 or 2" on the assessment "is not an indication that a student 'can't read' or is illiterate"; the State's "high performance standards ... have led to improvement over time"; and Florida "has outpaced the nation in closing" achievement and performance gaps that "exist throughout the country."
While Petitioners' proposed standard is problematic in and of itself, Petitioners' own pleadings expose the flaws in their arguments and highlight why Coalition requires that we approve the result reached by the First District. Indeed, what Petitioners seek is for the courts to order Respondents "to establish a remedial plan that ... includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students." (Emphasis added.) In other words, Petitioners do not know what a "high quality system" looks like, how it can be achieved, or what resources and standards are necessary. Instead, they-and presumably the courts-will know an "efficient" and "high quality" system, as well as an "adequate" level of overall funding, when they see a study that shows what it is. Petitioners invite this Court to not only intrude into the Legislature's appropriations power, see Coalition , 680 So.2d at 407 ("[P]resumably the Plaintiffs would expect the Court to evaluate, and either affirm or set aside, future appropriations decisions ...."), but to inject itself into education policy making and oversight. We decline the invitation for the courts to overstep their bounds.
Even if we were inclined to accept all of Petitioners' arguments regarding justiciability and separation of powers, on the record presented here Petitioners still could not prevail. At bottom, Petitioners' blanket challenge to the educational system is a funding challenge, one rooted in the notion that the Legislature is not providing *143 an adequate overall level of funding and that the lack of funding has resulted in disproportionate outcomes for certain students. That is clear from Petitioners' allegations, Petitioners' specific request for relief, and the rest of the record. Indeed, the trial court noted, among other things, that "[t]he primary thrust of [Petitioners'] complaint is that there is a crisis ... caused by the State of Florida's inadequate funding of education," that Petitioners "asserted that more resources were clearly needed to address the problems they identified in their complaint," and "that the evidence was focusing on [Petitioners'] 'need for more resources' argument." But the trial court's express findings doom Petitioners' funding challenge and theory of the case. Not only did the trial court find that Petitioners "failed to establish any causal relationship between any alleged low student performance and a lack of resources," but the trial court found that "the weight of the evidence ... establishes a lack of any causal relationship between additional financial resources and improved student outcomes." Petitioners' failure to establish such a causal relationship provides an independent basis for rejection of their claims.[10]
III. CONCLUSION
Given the blanket nature of Petitioners' challenge, the trial court's extensive and detailed findings after Petitioners were permitted to establish a factual record, and the failure of Petitioners to provide any manageable standard to support their challenge to the adequacy of the funding of the entire K-12 education system, we approve the result reached by the First District in affirming the trial court's rejection of Petitioners' challenge.
It is so ordered.
CANADY, C.J., and LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.
CANADY, C.J., concurs with an opinion, in which LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.
LABARGA, J., concurs in result only.
PARIENTE, J., dissents with an opinion, in which LEWIS and QUINCE, JJ., concur.
LEWIS, J., dissents with an opinion, in which PARIENTE and QUINCE, JJ., concur.
POLSTON, J., recused.

Among other things, the Second Amended Complaint included a new Count challenging the State's voluntary, pre-kindergarten program. That Count was severed and is not before this Court.

As discussed below, article IX, section 1(a) was amended in 2002 to impose certain class size requirements and to require the Legislature to fund the costs associated with meeting those requirements.

The First District specifically noted its agreement with the Pennsylvania Supreme Court's decision in Marrero v. Commonwealth , 559 Pa. 14, 739 A.2d 110, 112 (1999). However, as Petitioners point out, the Pennsylvania Supreme Court had distanced itself from Marrero prior to the First District's decision. See William Penn Sch. Dist. v. Pennsylvania Dep't of Educ. , 642 Pa. 236, 170 A.3d 414, 457 (2017) ("We find irreconcilable deficiencies in the rigor, clarity, and consistency of the line of cases that culminated in [Marrero ].").

Petitioners argue that the trial court incorrectly applied rational basis scrutiny and ask this Court to determine the appropriate standard and then remand so their claim can be reexamined under that standard. We find no need to address this argument. Petitioners also present arguments regarding the McKay and FTC programs. These arguments were not adequately preserved.

The dissent disputes the notion that Petitioners' claim is a " 'blanket challenge' to the entire state education system." Dissenting op. at 148 (Pariente, J.). But the blanket nature of Petitioners' claim is not reasonably in dispute. The original trial judge recognized that Petitioners sought "system-wide declaratory and supplemental relief." The trial judge who later rendered Final Judgment recognized that Petitioners "have 'made a blanket assertion that the entire system is constitutionally inadequate.' " (Quoting Coalition , 680 So.2d at 406.) And the First District recognized that Petitioners "assert[ed] that the State's entire K-12 public education system ... is in violation of the Florida Constitution." Citizens , 232 So.3d at 1165. The attempt by the dissenters to recharacterize this case is totally at odds with the way this case has been presented by Petitioners.

In a footnote, Coalition referenced a "four-category system" developed by certain scholars that "attempt[s] to measure the level of duty imposed on the state legislature" depending upon the language of the state's education clause. Coalition , 680 So.2d at 405 n.7. Coalition then contrasted Florida's 1868 education clause with the "present educational clause." Id.

The trial court here directly addressed Justice Overton's "excellent example of why the judicial branch should never say never," finding that "[t]his case is not about a significant level of illiteracy."

We disagree with the dissent's suggestion that the reasoning of Holmes was intended to and should apply to the type of blanket challenge brought in this case. Dissenting op. at 150 (Pariente, J.). Not only did Holmes expressly note the "narrow" scope of the issue presented in that case, Holmes , 919 So.2d at 397, but Holmes turned on language in article IX that long predated the 1998 amendments.

The dissent attempts to undercut amicus's sound logic in part by stating that amicus was "founded by former Governor Jeb Bush" and citing the website "conservativetransparency.org" to support the assertion that amicus's mission is to privatize schools. Dissenting op. at 152 n.18 (Pariente, J.). We disagree with the dissent's ad hominem approach to challenging logic and reason, an approach that not so subtly attempts to drag politics into judicial decision making.

The dissent disagrees that Petitioners' failure on this point provides an independent basis for rejecting Petitioners' claims. Dissenting op. at 154 (Pariente, J.). The dissent simply fails to acknowledge what indisputably is the "primary thrust" of this case.